**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ROBERT BUTLER,**

                                        **Plaintiff,**

        **vs.**                                                **1:16-cv-1540**
                                                                **(MAD/CFH)**

**ERIC HESCH,** *City of Schenectady Police Detective***;**
**THOMAS DISBROW,** *Former City of Schenectady*
*Police Detective***; PAUL STEELE,** *Former City of*
*Schenectady Police Detective***; MARK MEEKS,**
*United States Bureau of Alcohol, Tobacco, Firearms,*
*and Explosives Special Agent***; MARK MAHER,**
*United States Bureau of Alcohol, Tobacco, Firearms,*
*and Explosives Special Agent***; and JASON**
**STOCKLAS,** *United States Bureau of Alcohol,*
*Tobacco, Firearms, and Explosives Special Agent***,**

                                        **Defendants.**
_____

**APPEARANCES:**                        **OF COUNSEL:**

**GETZ & BRAVERMAN, P.C.**              **RAYMOND E. GAZER, ESQ.**
172 East 161st Street
Bronx, New York 10451
Attorneys for Plaintiff

**NAPIERSKI, VANDENBURGH,**             **SHAWN F. BROUSSEAU, ESQ.**
**NAPIERSKI & O'CONNOR, LLP**           **DIANE LUFKIN SCHILLING, ESQ.**
296 Washington Avenue Extension        **THOMAS J. O'CONNOR, ESQ.**
Albany, New York 12203
Attorneys for Defendants Hesch,
Disbrow, and Steele

**OFFICE OF THE UNITED**                **KAREN FOLSTER LESPERANCE, AUSA**
**STATES ATTORNEY**
James T. Foley U.S. Courthouse
445 Broadway, Room 218
Albany, New York 12207-2924
Attorneys for Defendants Meeks,
Maher, and Stocklas

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiff commenced this action on December 28, 2016, pursuant to 42 U.S.C. §§ 1983 and 1985, the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution, and *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), complaining of constitutional and civil rights violations stemming from Plaintiff's arrest and detention. *See* Dkt. No. 1.

Currently before the Court are Defendants Maher, Meeks and Stocklas' motion to dismiss and Defendants Disbrow, Hesch, and Steele's motion for judgment on the pleadings . *See* Dkt. Nos. 23 & 28.

## II. BACKGROUND

### A.    The Fire

On May 2, 2013, sometime around 4:00 a.m., a fire broke out at 438 Hulett Street, in Schenectady, New York, killing one adult, three children, and severely injuring another small child. *See* Dkt. No. 1 at ¶ 19. Carbon monoxide, burns, and smoke inhalation caused the deaths of David Terry, and his two small children, Layah and Michael Terry, along with eleven-month old Donovan Duell. *See id.* Sa'Fyre Terry, then five-years old, survived but was severely burned. *See id.*

Although not present at the time of the fire, Plaintiff had been intermittently residing at 438 Hulett Street, along with his then-girlfriend Jennica Duell. *See id.* at ¶ 20. Plaintiff last resided there in April of 2013. *See id.* Duell was the mother of the three deceased children and

one injured child and, at the time of the fire, still resided in the home with her ex-boyfriend, the decedent David Terry, who was the father of three of the children. *See id.*

Almost immediately after the fire, the City of Schenectady Fire Department contacted the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to assist in the investigation of the fire. *See id.* at ¶ 21. During the ensuing days and months, various federal, state, and local members of law enforcement joined in the investigation. *See id.* Almost immediately after the fire was extinguised, arson was suspected. *See id.* at ¶ 22. The investigation revealed that the fire in the building, a wood-framed, two-family residence, started in the stairwell leading to the second story apartment. *See id.* Further, the cause of the fire was determined to be intentionally set by someone igniting gasoline that was placed in the stairwell. *See id.*

On the day before the fire, May 1, 2013, Plaintiff had stayed at a motel in Saratoga Springs with two friend, including Bryan Fish. *See* Dkt. No. 1 at ¶ 23. After leaving the motel, Plaintiff and Fish "walked around Saratoga Springs and hung out in both a Stewart's Ice Cream Shop and McDonalds on Broadway." *See id.* Sometime between 4:00 and 5:00 p.m. on that date, Jennica Duell met Plaintiff and Fish after traveling from Schenectady. *See id.* The three continued to hang out in Saratoga with various other friends before spending the night at a friend's apartment at Jefferson Terrace, a public housing development in Saratoga Springs. *See id.*

At around 8:30 a.m., on May 2, 2013, Plaintiff, Duell, and Fish awoke and went to a Stewart's on South Broadway to purchase breakfast and snacks to prepare for their travel back to Schenectady. *See id.* at ¶ 24. It was there where, on a television displaying the news, the three learned about the fire and ensuing fatalities. *See id.* "Their reactions of shock, grief, and hysteria

-3-

were recorded on the store's surveillance system, including [P]laintiff punching something." *Id.*

After watch the report, the three obtained cab fare back to Schenectady from a sympathetic

waitress at a restaurant. *See id.* at ¶ 25. Besides expressing their obvious anguish, Duell

additionally discussed who she believed was responsible for setting the fire that killed her

children and David Terry. *See id.* According to the complaint, Duell was recorded stating "'I do

not know if a part of me thinks that someone started the fire, was started. Because Dave's . . .

been having issues with his girlfriend's ex and he threatened to kill Dave.'" *Id.* Duell also

borrowed the cab driver's telephone to call people to learn more of the circumstances surrounding

the fire. *See id.*

**B.    The Investigation**

According to the complaint, it was back in Schenectady where Plaintiff learned for the

first time that, despite not being in the same county as the fire, he was the prime suspect for

having set it. *See* Dkt. No. 1 at ¶ 26. After arriving at Duell's mother's house with Duell, he

exited the apartment to get fresh air and was immediately confronted by various members of the

Schenectady Police Department. *See id.* Plaintiff was asked if he wanted to accompany them to

the police station to talk about the fire and he agreed to do so. *See id.*

Once at the police station, law enforcement, including Defendant Eric Hesch, questioned

Plaintiff concerning the fire and his whereabouts that morning and the previous night. *See id.* at ¶

27. Plaintiff told them about his time in Saratoga Springs and was asked for names of people who

could corroborate his story and verify his alibi, which he promptly provided. *See id.* Aside from

both Duell and Fish, Plaintiff provided the detectives with three names of individuals he was with

in Saratoga, including the resident of the apartment in Jefferson Terrace, where he had spent the

night. *See id.* Plaintiff also conveyed to them the location of the Stewart's where he learned of

the fire and that he traveled back to Schenectady in a cab. *See id.* In fact, while it was then

unknown to him, Plaintiff later learned that, after he and Duell had exited the cab, the police

removed Bryan Fish from it. *See id.*

During the initial questioning, detectives asked Plaintiff if he knew whether anyone would

have a motive to start the fire. *See* Dkt. No. 1 at ¶ 28. Plaintiff mentioned to them that he was

aware that an individual named Edward Leon had been involved in an ongoing dispute with

David Terry over a woman, Bryanne Frolke, who had, in the past, dated Leon but was then dating

Terry. *See id.* Plaintiff also mentioned that he was aware, both from his stay at Terry's residence

and through Duell, that Terry and others close to him had been receiving threatening text

messages, some anonymous and some purportedly from "The Undertaker." *Id.* Plaintiff told

them that everyone concerned knew that the text messages were from Leon. *See id.*

At this point, investigators, including Defendant Meeks, continued to investigate Plaintiff

and told him that he had been implicated in the fire by his own friends and that his bringing up

Edward Leon was an attempt to shift the blame from himself to others. *See id.* at ¶ 29. In fact,

they accused Plaintiff of being the person who sent the anonymous and "The Undertaker" signed

texts. *See id.* Investigators confronted Plaintiff with texts from a third party's telephone, later

determined to be Fish's, in which Fish described Plaintiff as being angry. *See id.* According to

the complaint, Defendant "Hesch or another investigator also claimed to smell gasoline on

[P]laintiff, in spite of later forensic tests being negative for the presence of gasoline on

[P]laintiff's clothing." *Id.*

Unbeknownst to Plaintiff, Duell was also transported to the police station shortly after

Plaintiff arrived. *See id.* at ¶ 30. After the initial questioning, the detectives left Plaintiff alone in

a room for hours when, as Plaintiff later learned, they began questioning both Duell and Fish. *See id.*

During their initial investigation, Defendants Stocklas, Maher, and Hesch, among others, questioned Fish, who had a documented history of learning disabilities and attention deficit disorder. *See id.* at ¶ 31. Initially, as is set forth in the federal criminal complaint, Fish's version of the events of the night of the fire mimicked Plaintiff's. *See id.* Fish claimed that he had been with Plaintiff, Duell, and others in Saratoga the entire night. *See id.* According to the complaint, "[a]fter Fish continued to persist in this accurate version of events, he was told that someone placed him at the fire scene." *Id.* Defendant Stocklas eventually told Fish that a newspaper reported had not only seen him at the location, but that this reporter also picked him out of a photo array, "a story that was untrue and obviously a ruse, while another investigator warned him to the effect of 'He'd never again see the light of day.'" *Id.* It was at this point that Fish revealed how he, Plaintiff, and Duell had been drinking and using drugs the night before and, as such, he could not remember many details. *See id.* At some point near the beginning of the interrogation Fish vomited and, when told that the potential sentence for anyone convicted of the arson was death, he threatened suicide. *See id.* Further, the complaint alleges that Defendant Stocklas or Defendant Maher "gratuitously mentioned to him that a water bottle had been used to pour gasoline at the fire scene. Where this information came from is unknown, but their mention of it occurred prior to Fish stating that a wattle bottle had been used." *Id.*

Eventually, Fish signed a sworn statement where he claimed that he, Plaintiff, and Duell traveled to Schenectady in a black car with an unknown driver. *See id.* at ¶ 32. While he stated that he did not know the route they traveled, he indicated that he thought the purpose of the trip was for them to fight Terry and another occupant of the Hulett Street house. *See id.* Fish recalled

smelling gasoline and further stated that he saw Plaintiff pour something into the hallway of the Hulett Street house from a Poland Spring water bottle and then light it. *See id.*

Defendants Disbrow and Steele, both then of the City of Schenectady Police Department, and others, questioned Duell for nine hours on May 2, 2013. *See id.* at ¶ 33. While being interrogated from 12:45 p.m. until at least 5:00 p.m., Duell maintained that she had been with Plaintiff and Fish in Saratoga Springs the entire night. *See id.* Within a half hour of her interrogation, Duell, like Plaintiff, mentioned Edward Leon as a possible suspect. *See id.* Duell indicated that he was the ex-boyfriend of decedent David Terry's girlfriend Bryanne Frolke. *See id.* Duell related how Frolke had been having problems with Leon and how her apartment had recently suffered a fire. *See id.* She told them that Leon was thought to have started that fire and, at one point in the interrogation, someone remarked, "in substance and in part, that if Leon set one fire, he was capable of setting the one under investigation." *Id.*

Nevertheless, investigators repeatedly warned Duell during this time that she would never again see her lone surviving child and told her that they did not believe her story. *See* Dkt. No. 1 at ¶ 34. Eventually, someone told her that several witnesses, including a tenant, placed her at the location of the fire. *See id.* At about 6:45 p.m., Duell signed a sworn statement that she was present with Fish and another person when Plaintiff allegedly started the fire. *See id.*

Three days after the first interrogation, Fish was again interviewed for hours and again provided a sworn statement. *See id.* at ¶ 35. After hearing Duell's statement, the complaint alleges that Defendants "attempted to conform and coalesce it with Fish's statement." *Id.* In some regards, the complaint contends that this second statement differed from the first "in material aspects." *Id.* For example, despite his earlier lack of memory, Fish now gave a detailed, street by street description of the route that he, Duell, Plaintiff and the driver took to Schenectady. *See id.*

He described the car as having four doors and being maroon in color.  *See id.*  He remembered

seeing a small red gas can with a yellow nozzle that Plaintiff used to pour gas into a Poland

Spring bottle. *See id.*  "Not surprisingly, the new details conformed to Duell's statement.  Despite

having no recollection of the events, he signed a detailed statement putting him at the crime scene

with Duell and implicating Butler and mentioned the use of a 'Poland Spring' water bottle."  *Id.*

"Thus, according to law enforcement accounts, both Duell and Fish, without having first

conferred with each other prior to their respective interrogations, still managed to give materially

consistent, albeit wholly false and contrived, detailed, and strikingly similar accounts of their and

Butler's involvement with the fire." *Id.* at ¶ 36.  Indeed, the federal criminal complaint refers to

the two stories as having been developed over time and notes that there are several

inconsistencies that developed:

> Butler told detectives that he had not committed the arson and had
> been in Saratoga all night.  [Fish and Duell] initially also said they
> had been in Saratoga all night, but later gave sworn statements
> describing their presence with Butler in Schenectady when he set
> the fire.  Their statements, and those of other witnesses, have
> developed over time, and there are some inconsistencies between
> witness accounts of the route of travel, acquisition of gasoline, and
> other details.  However, after recanting their initial echoing of
> Butler's alibi, eyewitnesses have consistently stated that Butler set
> the fire.

Dkt. No. 1-2 at ¶ 9.

On June 4, 2013, Eric Fish was again interrogated and provided what would be his third

known sworn statement concerning the fire.  *See* Dkt. No. 1 at ¶ 37.  Notably, Fish acknowledged

that he had not been honest with investigators concerning the fire.  *See id.*  He further admitted to

testifying falsely before th grand jury and acknowledged that Defendant Maher had shown him

documents and portions of the investigations which "proved" that he had not been truthful

previously.  *See id.*  In this version of events, on the morning of the fire, Fish claimed that

Plaintiff drove a dark colored car to Schenectady with him and Duell in it.  *See id.*  This time, in contrast to a previous detailed description of the route from Saratoga to Schenectady, he had no recollection of what roads they took.  *See id.*  Further, despite his earlier denials of any supposed intention to commit arson, Fish now claimed that, on the way to Schenectady, Plaintiff openly remarked "They're dead.  They're gonna burn."  *Id.*  On March 4, 2014, Fish made a handwritten statement denying that he was at 438 Hulett Street on the night of the fire.  *See id.* at ¶ 38.

According to the complaint, despite hours of interrogation, Plaintiff "never deviated from his truthful account of his whereabouts and the events of the prior evening and never claimed any involvement in the fire, *i.e.*, he maintained that he had been in Saratoga the entire evening."  Dkt. No. 1 at ¶ 39.  Plaintiff also claims that he "did say something to the effect that he would never want to hurt Duell and the children," which law enforcement apparently considered to be an inculpatory admission of his guilt.  *See id.*  Plaintiff was arrested and charged in state court with, among other things, multiple counts of murder and arson.  *See id.*  After his arraignment on those charges, Plaintiff was remanded to the Schenectady County jail.  *See id.*

Upon seeing news reports of Plaintiff's arrest, James Frolke telephoned the Schenectady Police Department to inform them that he believed that Plaintiff was not responsible for the fire. *See id.* at ¶ 40.  James Frolke is the father of Bryanne Frolke, who was then the girlfriend of the decedent David Terry and who had once dated Edward Leon.  *See id.*  James Frolke informed the police that his daughter had recently broken up with Leon and characterized the breakup as "tumultuous."  *Id.*  He stated that Leon sent his daughter several unsettling and threatening text messages.  *See id.*  Frolke noted that Leon had a tattoo of a wedding ring with Bryanne's initials on his finger.  *See id.*  He recounted for the police an incident in March of 2013, a week after Bryanne had asked Leon to leave her residence.  On that occasion, Leon had visited Bryanne and

her children when that house caught fire. *See id.* Leon boasted of helping Bryanne and the children out of the burning house. *See id.* Despite this, James told the police that he had suspected Leon of setting that fire due, in large part, to Leon's demeanor and several individuals claiming to have observed Leon with a gas can before the fire broke out. *See id.* As such, Plaintiff claims that, only hours after the fire, Edward Leon's name had been mentioned as a person with a motive by three separate individuals, Plaintiff, Duell, and James Frolke. *See id.* According to Plaintiff, James Frolke had no prior relationship with either Plaintiff or Duell. *See id.*

James Frolke further recounted how Leon attempted to see Bryanne on the morning of the fatal fire and that James refused to let him see her. *See id.* at ¶ 41. He recalled that, on that day, Leon was driving a light colored minivan with a different colored back door. *See id.* According to James Frolke, members of the Schenectady Police Department told him that they had "pretty good information that [Plaintiff] is the guy and that they pretty much dismissed what [he] had to say." *Id.*

On May 6, 2013, Duell returned to the police station and was again questioned. *See* Dkt. No. 1 at ¶ 42. During this interrogation, Duell reiterated her initial claim that neither she, Plaintiff, nor Fish left Saratoga the night or morning prior to learning of the fire. *See id.* According to the complaint, an investigator who was apparently not satisfied "with her recantation of her incriminating statement" told her the following:

> You're not being honest with us, Jennica. We have all the video footage from the time you guys walk out of Broadway and get in the car you already told us about. From your voice being heard in the hallway to the point where you say two guys drag you in. We canvassed the whole neighborhood. They see you getting dragged in the car. Do not start lying now. You start lying about this and you lie in front of a grand jury you will go to prison for the rest of your life and you will not see Sa'Fyre.

*Id.*

Thereafter, on May 24, 2013, Duell testified before a federal grand jury that she, Plaintiff, Fish, and an individual named Ricky drove to Schenectady where, after obtaining gasoline, Plaintiff set fire to the building at 438 Hulett Street. *See id.* As a motive, Duell claimed that Plaintiff wanted "to free her from her ex-boyfriend – the father of several of her children – David Terry." *Id.* Duell even claimed that she had encouraged Plaintiff by asking him, prior to him allegedly starting the fire, "'Do you want to be free?'" *Id.*

"In and around July of 2013, Duell publicly recanted this testimony. Among other things, she stated, 'I was telling cops whatever they wanted to hear so I could get home to Sa'fyre, even if that means I have to lie to be next to my daughter. I would do anything to be by my child's side. I'm sorry, but I'm a mother first.'" *Id.* at ¶ 43 (quoting Fitzgerald, B., *Mother In Fatal Schenectady Fire Changes Story, Says She Lied To Grand Jury*, TIMES UNION, July 15, 2013, *available at* http://blog.timesunion.com/crime/mother-in-fatal-schenectad y-fire-changes-story-says-she-lied-to-grand-jury/13815/ (last visited Dec. 11, 2017)). Additionally, on January 31, 2014, Duell recanted her testimony inculpating Plaintiff to a federal grand jury, admitting that her previous testimony before it had been untruthful. *See id.* at ¶ 44.

On June 4, 2013, the aforementioned federal criminal complaint was filed against Plaintiff charging him with the destruction of property by fire or explosive resulting in death in violation of 18 U.S.C. § 844(i). *See* Dkt. No. 1 at ¶ 46. As such, although Plaintiff was already detained, as of June 4, 2013, he was in federal custody. *See id.* Soon thereafter, Plaintiff was informed that the Government was considering seeking the death penalty in the event of conviction. *See id.*

During the investigation, it was alleged that Plaintiff sent numerous text messages to David Terry. *See id.* at ¶ 47. Despite these allegations, no such message was linked to a phone

that Plaintiff owned or controlled. *See id.* Additionally, Plaintiff claims that it is unclear how Defendants initially attributed these messages to him. *See id.*

The complaint further alleges that the City of Schenectady maintained pole cameras that recorded activity in and around the fire, which were operable on the morning of May 2, 2013. *See id.* at ¶ 48. Sometime soon after the fire, federal and local law enforcement agents sized the footage. *See id.* This footage later revealed a minivan with a different color rear door, similar to the one James Frolke had observed Edward Leon driving the morning of the fire, drive toward 438 Hulett Street seven minutes before the fire. *See id.* Another camera recorded footage of the same van leaving the Hulett Street area moments before flames could be seen engulfing a building in the distance. *See id.* During the weeks after the fire, "even despite Duell's wavering and inconsistent claims, no effort was made to connect Edward Leon and his distinctive two-toned minivan to the deadly fire." *Id.*

From the time of his initial arrest through the present, Plaintiff has maintained that, during the time of the fire, he was with Duell, Fish, and others, including Mike Barnes and Mindy Nokes, who had been staying at Jefferson Terrace in Saratoga. *See* Dkt. No. 1 at ¶ 49. Both of these individuals continually confirmed Plaintiff's alibi in Saratoga, which Plaintiff claims did little to sway Defendants. *See id.* Instead, Defendants Meeks, Maher and others "threatened both with arrest for helping [P]laintiff and accused Barnes of taking part in the arson." *Id.* Further, Plaintiff alleges that, at various times, Defendants Meeks and Maher showed both Barnes and Nokes photographs of the sole surviving child, which depicted serious burns and injuries that were caused by the fire. *See id.* Notwithstanding, Barnes and Nokes both continued to maintain that Plaintiff, Fish, and Duell were all with them in Saratoga during the morning of the fire. *See id.*

-12-

On February 7, 2014, the federal criminal charges pending against Plaintiff were dismissed without prejudice. *See id.* at ¶ 50. Despite the grand jury investigation, Plaintiff was never indicted. *See id.* According to the complaint, while it is unknown what specific factor precipitated the dismissal, "[P]laintiff's criminal attorney and investigator made the United States Attorney's Office aware of the pole cameras which depicted what appeared to be Edward Leon's distinct two-toned vehicle in the vicinity of the fire." *Id.* Additionally, Plaintiff claims that his "investigator was able to determine the source of threatening messages sent to David Terry originated from a prepaid phone purchased in Westchester County, New York, a phone which was subsequently linked to Edward Leon." *Id.*

After Plaintiff's criminal charges were dismissed, it was revealed that, on November 14, 2013, Defendant Meeks interviewed Edward Leon who denied using the phone number that sent the threatening messages to David Terry and Brianne Frolke and denied being near the site of the fire on May 2, 2013. *See* Dkt. No. 1 at ¶ 51. On November 22, 2013, Leon provided testimony before the grand jury that was consistent with his interview with Defendant Meeks. *See id.* On January 2, 2014, over one month before the charges against Plaintiff were dismissed, Leon, when confronted with the video surveillance, told Defendants Hesch and Maher that he was at the scene of the fire of 438 Hulett Street during the early morning of May 2, 2013, for the purpose of confronting David Terry about his relationship with Brianne Frolke. *See id.* During this interview, Leon also admitted to sending the threatening text messages to Terry. *See id.*

On November 12, 2015, Edward Leon was convicted of two counts of perjury for his false statements before the grand jury. *See id.* at ¶ 52. On March 17, 2016, Leon was sentenced to ten-years incarceration on his perjury conviction and he remains a suspect in the arson at 438 Hulett Street. *See id.*

Jennica Duell was charged with and, on May 16, 2016, subsequently pled guilty, to four counts of perjury in relation to her grand jury testimony. *See* Dkt. No. 1 at ¶ 54. Specifically, as part of her plea agreement, she admitted that she provided the grand jury with material matters that were irreconcilably contradictory regarding Plaintiff's whereabouts the night of the fire. *See id.* On September 12, 2016, Duell was sentenced to 135 months imprisonment. *See id.*

According to the complaint, several Defendants interrogated Richard Ramsey, an individual thought to be the "Ricky" that Duell referred to in her grand jury testimony. *See id.* at ¶ 55. After the interrogation, Richard Ramsey implicated Plaintiff and testified before the grand jury on October 11, 2013, "in substance and in part, that [P]laintiff had asked to borrow his red Nissan Sentra, and that on the morning of May 2, 2013, he had left it outside his dorm with the keys in the glove compartment for Butler to pick up." *Id.* Ramsey further testified that he was "awoken by the sound of his vehicle's motor being started up in the middle of the night at around 3:00 a.m. and then seeing his car back outside the dorm at 7:00 or 7:30 a.m." *Id.* Subsequently, however, Ramsey testified before the grand jury on January 10, 2014, "in substance and in part, that he drove to Jefferson Terrace and dropped the vehicle off to [P]laintiff on the night of May 1st, 2013, before being given a ride back to his job at the racetrack by someone else." *Id.* During both appearances, Ramsey also testified that he "junked" his car because he was afraid of being implicated in the fire. *See id.* According to Plaintiff, "Ramsay eventually recanted all of these statements before the grand jury, admitting that [P]laintiff never asked to borrow his vehicle and stating that he junked his car because he could not afford the insurance and repairs." *Id.* Plaintiff claims that it is "unclear whether any attempt was made to find the purportedly junked Nissan or to identify its presence on surveillance in the vicinity of the Hulett Street house during the time of the fire, as was eventually done with Leon's car." *Id.* at ¶ 56.

On November 22, 2014, Richard Ramsey was again interrogated by and provided a sworn statement to Defendant Maher. *See* Dkt. No. 1 at ¶ 57. At this point, the charges against Plaintiff had already been dismissed and Leon had already admitted to sending threatening text messages to David Terry and to being in front of the Hulett Street house at the time of the fire. *See id.* In fact, at this point both Duell and Leon had been indicted for perjury concerning, among other things, Plaintiff's role in allegedly setting the fire. *See id.* Despite this, Plaintiff claims that the subject of Ramsey's November 22, 2014 interrogation was "once again [P]laintiff's role in the fire." *Id.* "To that end, Ramsey swore that he drove [P]laintiff, Duell, and Fish to Schenectady where he waited while they left the vehicle. He stated that he later learned that [P]laintiff had sprinkled gasoline on the steps of the building. He recounted observing flames and then seeing the Mohawk Rescue Squad arrive at the scene. Despite almost certainly incriminating himself, Ramsey was not then charged in connection with the fire." *Id.*

On October 21, 2016, Richard Ramsey was charged with perjury for his grand jury testimony concerning his vehicle and its role in the fire. *See id.* at ¶ 59. Similarly, also on October 21, 2016, Bryan Fish was charged with perjury for his grand jury testimony concerning the fire. *See id.*

**C.   Allegations**

In his complaint, Plaintiff contends that, all told, four people (Leon, Fish, Ramsey, and Duell) have been charged with perjury in connection with the investigation of the fire and that, of these four, both Leon and Duell have been convicted and sentenced. *See* Dkt. No. 1 at ¶ 60. Plaintiff claims that, not only did Duell, Fish, and Ramsey commit perjury but that, in doing so, they inculpated themselves, along with Plaintiff, in varying roles related to the arson and quadruple homicide. *See id.*

Plaintiff claims that Defendants "maliciously instituted and maintained a criminal proceeding against [P]laintiff that was unsupported by just and probable cause[.]" *Id.* at ¶ 64. Specifically, Plaintiff argues that Defendants engaged in the following conduct that violated his rights: (a) coercing witnesses into implicating Plaintiff after their initial failure to do so; (b) threatening witnesses if they did not implicate Plaintiff in criminal wrongdoing; (c) suggesting versions of events to witnesses that would make their accounts both consistent with each other and consistent with Defendants' theory of the crime; (d) providing witnesses with accounts and feeding them information that supported Defendants' erroneous theory of Plaintiff's role in the fire; (e) reconciling previous inconsistent statements by supplying details in order to make witness statement's appear corroborated and accurate; (f) ignoring Fish, Duell, and Plaintiff's initially consistent version of the morning of the fire that the three never left Saratoga; (g) coaching witnesses to arrive at Defendants' predetermined versions of events; (h) failing to investigate whether a dark car, as stated by Fish, or a red Nissan, as stated by Ramsey, were seen at or near the fire scene, including on the pole cameras; (i) failing to review security footage which had been seized and was in the custody of law enforcement personnel, which footage would have supported known, alternative theories of who started the fire; (j) falsely claiming that Plaintiff smelled like gasoline on the morning of the fire; (k) ignoring the suggestion from an identified citizen-informer that Edward Leon may have been responsible for the fire, particularly when Leon's name was also provided to them by Plaintiff and Duell as an individual with a motive and an individual who may have engaged in arson previously; (l) ignoring that both Fish and Duell changed their statements in material respects early on in the investigation; and (m) encouraging witnesses to implicate Plaintiff. *See id.*

In count one of the complaint, Plaintiff alleges that Defendants Hesch, Disbrow, and Steele (the "Schenectady Defendants") violated his rights under the Fourth and Fourteenth Amendments to be free from "unreasonable seizure, unlawful arrest, malicious prosecution, and unlawful force." Dkt. No. 1 at ¶ 69.  Count two alleges that Defendants Meeks, Maher, and Stocklas (the "ATF Defendants") also violated Plaintiff's rights under the Fourth and Fourteenth Amendments to be free from "unreasonable seizure, unlawful arrest, malicious prosecution, and unlawful force." *Id.* at ¶ 72.  In both counts of the complaint, Plaintiff also alleges a conspiracy to violate his rights.

### III. DISCUSSION

**A.    Standard of Review**

Rule 12(c) of the Federal Rules of Civil Procedure provides that "after the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  When a party makes a Rule 12(c) motion, the court applies the same standard as when a party files a Rule 12(b)(6) motion.  *See Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (citation omitted).

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief.  *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted).  In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted).  This presumption of truth, however, does not extend to legal conclusions.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the

pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting [*Twombly*, 550 U.S.] at 557, 127 S. Ct. 1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed[,]" *id.* at 570.

## B.    Abandoned Claims

In both motions to dismiss, Defendants argue that the excessive force claim should be dismissed as untimely and because no facts were alleged to establish that any force was used, let alone excessive force. Additionally, the ATF Defendants argued that Plaintiff's Fourteenth Amendment claims must be dismissed against them because the Fourteenth Amendment applies only to state actors and the ATF Defendants were acting under color of federal not state law. In

his response, Plaintiff does not address these claims or the arguments raised in the motions to dismiss. As such, the Court finds that Plaintiff, who is represented by counsel, has abandoned these claims. *See Romeo & Juliette Laser Hair Removal, Inc. v. Assara I, LLC*, No. 08-cv-442, 2014 WL 4723299, *7 (S.D.N.Y. Sept. 23, 2014) (citing *Dineen v. Stramka*, 228 F. Supp. 2d 447, 454 (S.D.N.Y. 2002)).

Alternatively, the Court finds that the claims fail on the merits. In his complaint, Plaintiff makes no mention of any use of force, reasonable or otherwise. As such, he has failed to plead such a claim. Additionally, the ATF Defendants correctly assert that the Fourteenth Amendment claims against them must be dismissed because the Fourteenth Amendment applies only to the states and actions done under the color of state law. *See District of Columbia v. Carter*, 409 U.S. 418, 424 (1973); *Arar v. Ashcroft*, 585 F.3d 559, 568 (2d Cir. 2009) (citations omitted).

Based on the foregoing, the Court grants Defendants' motions to dismiss as to these claims.

## C.    Statute of Limitations

Defendants argue that Plaintiff's claims for false arrest and false imprisonment are time barred under the applicable three-year statute of limitations. *See* Dkt. No. 23-1 at 8-9; Dkt. No. 28-2 at 7-8.

The statute of limitations for actions brought pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and 42 U.S.C. § 1983 is borrowed from the state statute of limitations for personal injury actions under the law of the state in which the federal court sits. *See Griffin v. Doe*, 71 F. Supp. 3d 306, 317 (N.D.N.Y. 2014) (citing *Owens v. Okure*, 488 U.S. 235, 250-51 (1989) (section 1983); *Gonzalez v. Hasty*, 651 F.3d 318, 321 (2d Cir. 2011) (*Bivens*)) (other citations omitted). Federal courts sitting in New York apply a three-

year statute of limitations period to claims arising under *Bivens* and Section 1983. *See Griffin*, 71 F. Supp. 3d at 317 (citations omitted). A statute of limitations provides an affirmative defense, and the burden is on the defendant to establish when a claim accrues. *See Gonzalez v. Hasty*, 651 F.3d 318, 322 (2d Cir. 2011) (citing Fed. R. Civ. P. 8(c)).

While state law dictates the applicable statute of limitations, the accrual date of these causes of action is a question of federal law that is not resolved by reference to state law. *See Wallace v. Kato*, 549 U.S. 384, 388 (2007). A claim accrues "'when the plaintiff knows or has reason to know of the injury which is the basis of his action.'" *Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997) (quoting *Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980)).

The statute of limitations for a claim of false imprisonment — and false arrest, which is a species of false imprisonment — begins to run "when the alleged false imprisonment ends." *Wallace*, 549 U.S. at 388-89 (internal quotation marks omitted). False imprisonment ends when "'the victim becomes held pursuant to [legal] process — when, for example, he is bound over by a magistrate or arraigned on charges.'" *Lynch v. Suffolk Cnty. Police Dep't, Inc.*, 348 Fed. Appx. 672, 675 (2d Cir. 2009) (quoting *Wallace*, 549 U.S. at 388-89). The Supreme Court has explained that, when a plaintiff brings a false arrest claim, "'damages for that claim cover the time of detention up until issuance of process or arraignment, but not more. From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself.'" *Wallace*, 549 U.S. at 390 (quotation omitted). "In short, a false imprisonment claim starts to run when a detainee begins to be held pursuant to legal process." *Watson v. United States*, 865 F.3d 123, 131 (2d Cir. 2017).

In the present matter, Defendants argue that Plaintiff's false arrest and false imprisonment claims are untimely. According to the ATF Defendants, Plaintiff's false imprisonment claim did

not accrue when he was released from custody after the Government dismissed the charges against him, but rather when he waived his right to a detention hearing on June 5, 2013 and was ordered detained by Magistrate Judge Hummel.  *See* Dkt. No. 23-1 at 8.  The Schenectady Defendants argue that Plaintiff's false imprisonment claim accrued against them no later than June 4, 2013, when Plaintiff was released from state custody and transferred to federal custody.  *See* Dkt. No. 28-2 at 7.  Since this action was not commenced until December 28, 2016, Defendants argue that these claims are barred by the applicable three-year statute of limitations.

In response, Plaintiff argues that these claims are timely and attempts to explain why the Supreme Court's decision in *Wallace v. Kato*, 549 U.S. 384 (2007) is inapplicable to the present matter.  *See* Dkt. No. 29 at 9.  While Plaintiff acknowledges that the Supreme Court in *Wallace* held that a claim for false arrest accrues when the arrestee is brought before a magistrate, he claims that the Court's "holding was based on the institution of valid legal process supported by an independent determination of probable cause."  *Id.*  More recently, however, Plaintiff argues that the Supreme Court "has differentiated between situations where process is validly initiated and situations where, as here, it is alleged that the entire institution of process is based on fabricated evidence."  *Id.*  Specifically, Plaintiff argues as follows:

> In *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911 (2017), which itself involved the statute of limitations, the Court discussed the situation where probable cause is based on fabricated evidence, stating: "Then, too, a person is confined without constitutionally adequate justification.  Legal process has gone forward, but it has done nothing to satisfy the Fourth Amendment's probable-cause requirement.  And for that reason, it cannot extinguish the detainee's Fourth Amendment claim . . . ."  *Id.* at 918-19.  In such a circumstance, the Court held that a Fourth Amendment claim is appropriate both for the pre-judicial and post-judicial detention because "the judge's order holding the [plaintiff] for trial therefore lacked any proper basis."  *Id.* at 919.  The Court further stated that, subject to the statute of limitations, the plaintiff could maintain claims for both "wrongful arrest" and "wrongful detention."  The

> Court characterized the entire action as a "Fourth Amendment
> claim," . . . and remanded the matter for the determination of
> whether the statute of limitations should begin to run upon
> presentation to the magistrate or upon the favorable termination of
> the prosecution.  It likened the former as analogous to the tort of
> malicious prosecution and later [sic] as analogous to the tort of false
> arrest.  *Id.* at 921-22.

Dkt. No. 29 at 9-10.  Plaintiff concludes that, considering his entire detention is now cognizable

under *Manuel* "as one 'Fourth Amendment claim,' the accrual of the claim logically should be

when the wrongful detention ended.  Where the legal process is invalid and without any proper

basis, its role in 'converting' confinement from that based upon false imprisonment to malicious

prosecution is virtually nonexistent, particularly when the confinement has been continuous since

arrest."  *Id.* at 10.

        Contrary to Plaintiff's arguments, the recent *Manuel* decision does not render his false

imprisonment claims timely.  By way of background, the plaintiff in *Manuel* was pulled over for

failing to signal a turn; the police then physically assaulted him and arrested him without any

evidence that he had committed a crime.  *See Manuel*, 137 S. Ct. at 915.  At the police station, a

technician fabricated evidence, falsely claiming that a vitamin bottle that had been seized from

the plaintiff contained ecstasy.  *Id.*  A police office then charged the plaintiff with unlawful

possession of a controlled substance.  *Id.*  Later that day, a judge "relied exclusively on the

criminal complaint — which in turn relied exclusively on the police department's fabrications —

to support a finding of probable cause."  *Id.*  Thereafter, although the Illinois police laboratory

reexamined the seized pills and issued a report concluding that they contained no controlled

substances, the plaintiff's detention continued for another month.  *Id.* at 916.  In its holding, the

Supreme Court resolved the issue of whether the plaintiff could bring a Fourth Amendment claim

for unlawful pretrial confinement for confinement occurring after the start of "legal process" in a

criminal case – that is, "after the judge's determination of probable cause." *Id.* at 914. *Manuel* explained that, in some circumstances, an arrestee may state a Fourth Amendment claim "for his (post-legal-process) pretrial detention" where this required probable-cause determination rested entirely on police officers' false statements. *Id.* at 918-19. As such, the Supreme Court's sole holding was that a "seizure" under the Fourth Amendment can continue past an initial appearance in a criminal case, contrary to what the Seventh Circuit held in dismissing the case. *See id.* The Court specifically declined to address "what accrual rule should govern a § 1983 suit challenging post-legal-process pretrial detention." *Id.* at 921.[1]

Contrary to Plaintiff's position, *Manuel* does not stand for the proposition that false arrest and malicious prosecution may now be morphed into one generic Fourth Amendment claim that does not accrue until the illegal detention ends. False arrest and false imprisonment claims challenge detention without legal process, whereas a malicious prosecution claim challenges allegedly unlawful confinement after the initiation of legal process. The *Manuel* decision does not purport to – nor does it – change existing Supreme Court and Second Circuit jurisprudence with respect to the accrual of a Section 1983 unlawful arrest/unlawful imprisonment claim. Rather, the decision merely corrects the Seventh Circuit's error in precluding the assertion of a Fourth Amendment post-legal-process claim.

---

[1] The plaintiff in *Manuel* urged the Court to find that his Fourth Amendment claim accrued only upon the dismissal of the criminal charges, analogizing the claim to the common-law tort of malicious prosecution. *See Manuel*, 137 S. Ct. at 921. The Supreme Court noted that "all but two of the ten Courts of Appeals that have recognized a Fourth Amendment claim like his have incorporated a 'favorable termination' element and so pegged the statute of limitations to the dismissal of the criminal case." *Id.* (footnote omitted). The defendant, however, argued that the plaintiff's Fourth Amendment claim should be considered most analogous to the tort of false arrest and that it should accrue when legal process commences. *See id.* The Supreme Court declined to decide this issue and remanded the matter back to the Seventh Circuit.

As discussed above, Plaintiff was transferred to federal custody on June 4, 2013, and had an initial appearance before Magistrate Judge Hummel that same day. *See United States v. Butler*, No. 1:13-mj-277, Dkt. No. 4 (N.D.N.Y. June 5, 2013).  On June 5, 2013, Plaintiff filed a letter waiving his rights to both a detention and preliminary hearing. *See id.*  As such, Plaintiff's false arrest and false imprisonment claims accrued no later than June 5, 2013 and Plaintiff's December 28, 2016 complaint is untimely as to these claims.

Based on the foregoing, the Court grants Defendants' motions to dismiss as to Plaintiff's false arrest and unlawful imprisonment causes of action.

**D.    Malicious Prosecution**

To prevail on a Section 1983 claim for malicious prosecution, "a plaintiff must show a violation of his rights under the Fourth Amendment . . . and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (citations omitted).  Under New York law, a plaintiff must establish four elements to support a malicious prosecution claim: "'(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Id.* (quotation and other citations omitted); *see also Dufort v. City of New York*, 874 F.3d 338, 350 (2d Cir. 2017) (quotation omitted).  Initiating a criminal proceeding against a person without probable cause, coupled with a deprivation of liberty, is a Fourth Amendment violation. *See Murphy v. Lynn*, 118 F.3d 938, 944-45 (2d Cir. 1997) (citation omitted).

*1. Initiation or Continuation of Prosecution*

-24-

In their motion for judgment on the pleadings, the Schenectady Defendants argue that the complaint makes clear that Plaintiff's federal criminal prosecution was not initiated or continued by the Schenectady Defendants. *See* Dkt. No. 28-2 at 11. As such, the Schenectady Defendants contend that the complaint fails to allege a plausible malicious prosecution claim against them because it fails to allege that they either initiated the federal prosecution on June 4, 2013 or that they continued the prosecution at any point until it was dismissed without prejudice by federal prosecutors on February 7, 2014. *See id.* Similarly, the ATF Defendants argue that Plaintiff failed to establish this element because they did not create and forward false information to the prosecutors or withhold such information. *See* Dkt. No. 23-1 at 17 (citing *Mitchell v. Victoria Home*, 434 F. Supp. 2d 219, 228 (S.D.N.Y. 2006)).

The Second Circuit has held that although "police officers do not generally "commence or continue" criminal proceedings against defendants, a claim for malicious prosecution can still be maintained against a police officer if the officer is found to 'play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.'" *Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015) (quotations omitted). "This element might be satisfied by, for example, showing that an officer generated witness statements or was regularly in touch with the prosecutor regarding the case." *Id.* (citation omitted).

Recently, the New York Court of Appeals acknowledged that it has "'never elaborated on how a plaintiff in a malicious prosecution case demonstrates that the defendant commenced or continued the underlying criminal proceeding.'" *Torres v. Jones*, 26 N.Y.3d 742, 760-61 (2016) (quotation omitted). "But, by suggesting that a defendant other than a public prosecutor may be liable for supplying false information to the prosecutor in substantial furtherance of a criminal action against the plaintiff, we have implicitly recognized that such conduct may, depending on

-25-

the circumstances, constitute the commencement or continuation of the prosecution." *Id.* at 761 (citations omitted); *see also Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983) (noting that proof establishing "that the police witnesses" have falsified evidence may create liability for malicious prosecution); *Hopkinson v. Lehigh Val. R.R. Co.*, 249 N.Y. 296, 300-01 (1928) (noting that the falsification of evidence and presentation of that evidence to the prosecutor can constitute commencement of a prosecution).

In the present matter, the Court finds that Plaintiff has sufficiently alleged that the named Defendants "actively elicited inculpatory statements from witnesses . . . whose veracity in making such statements was circumstantially suspect[.]" *Manganiello*, 612 F.3d at 163. For example, the complaint alleges that Defendants Disbrow and Steele interrogated Duell for nine hours on May 2, 2013. *See* Dkt. No. 1 at ¶ 33. From 12:45 p.m. until at least 5:00 p.m., Duell maintained that she had been with Plaintiff and Fish in Saratoga Springs the entire night. *See id.* Further, near the beginning of the interrogation, Duell mentioned Edward Leon as a possible suspect and explained why she believed this. *See id.* Nevertheless, Defendants repeatedly warned her during her interrogation that she would never again see her lone surviving child and told her that they did not believe her story. *See id.* at ¶ 34. Eventually, one of the Defendants informed her that several witnesses, including a tenant, placed her at the location of the fire. *See id.* In response to these threats and false claims, Plaintiff alleges that, at approximately 9:45 p.m., Duell signed a sworn statement claiming that she was present with Fish and another person when Plaintiff allegedly started the fire. *See id.*; *see also* Dkt. No. 1-1 at 3.

Thereafter, on May 6, 2013, Duell was again interviewed and initially reiterated her claim that neither she, Plaintiff, nor Fish left Saratoga Springs on the night and morning prior to the fire. *See* Dkt. No. 1 at ¶ 42. According to the complaint, not being satisfied with her recantation of her

prior incriminating statement, Defendants told Duell that they knew she was not being honest with them and, among other things, that they had video evidence implicating her and warned her that, if she starts lying now, she "'will go to prison for the rest of your life and you will not see Safyre.'" *See id.* (quotation omitted).

As discussed in more detail above, Defendants engaged in similar acts as to other witnesses. This conduct, which involves actively eliciting inculpatory statements from witnesses whose veracity was unquestionably suspect, is sufficient to plausibly allege that Defendants commenced or continued the criminal prosecution.

Additionally, as to the ATF Defendants, they presented the criminal complaint to Magistrate Judge Hummel and, in doing so, withheld exculpatory information that may have impacted the probable cause determination. Including that Duell and Plaintiff both informed all Defendants that Edward Leon was the likely culprit and that he was suspected in another fire. Further, no mention is made of James Frolke's call to the Schenectady Police Department implicating Leon. Moreover, although the affidavit in support of the criminal complaint does mention the inconsistencies in Duell's and Fish's statements and that they have developed over time, the extent of the inconsistencies is not discussed in any detail.

Based on the foregoing, the Court finds that Plaintiff has plausibly alleged that Defendants commenced or continued the criminal prosecution.

### 2. Favorable Termination

Generally, in order to establish that a prosecution terminated in favor of a plaintiff, the plaintiff must establish that the prosecution was terminated on its merits. *See Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999) ("[A] decision on the merits [is] an essential element of a cause of action for malicious prosecution"). However, where an accused was not acquitted on the

merits, a plaintiff may still establish favorable determination by establishing a "final disposition ... such as to indicate the accused's innocence" or a formal abandonment by the prosecutor of the criminal proceeding. *See Fulton v. Robinson*, 289 F.3d 188, 196 (2d Cir. 2002) ("Where a prosecution did not result in an acquittal, it is generally not deemed to have ended in favor of the accused, for purposes of a malicious prosecution claim, unless its final disposition is such as to indicate the accused's innocence"); *see also Wong v. Yoo*, 649 F. Supp. 2d 34, 66 (E.D.N.Y. 2009); *Furgang & Adwar, LLP v. Fiber–Shield Indus.*, 55 A.D.3d 665, 666 (2d Dep't 2008) ("To show a termination in [its] favor, the plaintiff must prove that the court passed on the merits of the charge or claim against [it] under such circumstances as to show [its] innocence or nonliability, or show that the proceedings were terminated or abandoned at the instance of the defendant under circumstances which fairly imply the plaintiff's innocence") (citations omitted).

Generally, a plaintiff cannot establish a favorable termination, where that plaintiff can be prosecuted again for the same charge. *See Marino v. Jonke*, No. 11-CV-430, 2012 WL 1871623, *7 (S.D.N.Y. Mar. 30, 2012) (holding that there is no favorable termination when "the dismissal is without prejudice and the prosecution may proceed on an amended information"); *Anilao*, 774 F. Supp. 2d at 508 ("[A] termination will be deemed favorable only when 'there can be no further proceeding upon the complaint or indictment, and no further prosecution of the alleged offense'") (citations omitted); *Smith–Hunter*, 95 N.Y.2d at 197-98 (noting that where there is "no indication that the prosecutor abandoned charges against the accused[,]" there is not a final determination because "it is well settled that any 'disposition of the criminal action which does not terminate it but permits it to be renewed cannot serve as a foundation for the [malicious prosecution] action'") (alteration and citations omitted).  This rule exists to prevent the possibility of two courts considering the issue of whether probable cause existed at the same time, by preventing a civil

-28-

court from considering an action until it is certain that the state can no longer pursue the criminal prosecution. *See Garrett v. Port Auth. of N.Y. & N.J.*, No. 04-CV-7368, 2006 WL 2266298, *5 (S.D.N.Y. Aug. 8, 2006) (discussing the risk of "the possibility of inconsistent judgments" and "parallel litigation of the underlying probable cause determination" if malicious prosecution claims were allowed to proceed when a new indictment could still technically be brought); *Smith–Hunter*, 95 N.Y.2d at 197 (noting that "there might be two conflicting determinations as to the same transaction" if a malicious prosecution claim is allowed to proceed prior to a final termination). However, "'[a] dismissal without prejudice qualifies as a final, favorable termination if the dismissal represents the formal abandonment of the proceedings by the public prosecutor, for instance, by the entry of a *nolle prosequi*.'" *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 534 (S.D.N.Y. 2015) (quotation and other citation omitted).

In *Stampf*, the Second Circuit held that a declination of prosecution could suffice "to establish termination in the plaintiff's favor notwithstanding that the prosecutor is theoretically capable of resurrecting the prosecution." *Stampf*, 761 F.3d at 201. The Second Circuit reasoned that, if the law were otherwise:

> [I]t would mean that malicious prosecution claims often could not be brought in the cases where the accusations had the least substance. The cases that most lack substance are most likely to be abandoned by the prosecution without pursuing them to judgment. [T]he most unjustified accusations might thus be the most likely to be shielded from malicious prosecution claims.

*Stampf*, 761 F.3d at 201. Additionally, the Second Circuit has indicated that, whether a particular dismissal "qualifies as a final, favorable termination" requires consideration of the "particular circumstances presented" in each case. *See McGee v. Doe*, 568 Fed. Appx. 32, 40 (2d Cir. 2014).

In the present matter, the Court finds that Plaintiff has adequately alleged that the dismissal of the criminal complaint constituted a formal abandonment of the charges. The order for dismissal, which was drafted by the Government, states as follows:

> This case involves unusual and complex facts, with the complaint based upon allegations (in the affidavit in support of the complaint) that the defendant used gasoline to start a fire at a residential rental property in Schenectady, New York that resulted in the destruction of the building and its contents and the deaths of a father and three young children and very serious burn injuries for another child. The gravity of the crime and the potential punishments, the unusual and complex facts, including information regarding the involvement of others, and the circumstances regarding eyewitnesses, necessitate further investigation.

*United States v. Butler*, No. 1:13-MJ-277, Dkt. No. 17 (N.D.N.Y.). This order provides little helpful information regarding the reasons for the dismissal.

The complaint in the present matter, however, makes clear that the dismissal of the criminal charges was because the Government had no credible evidence linking Plaintiff to the crime. Rather, the only evidence against Plaintiff was from four individuals who provided continually evolving statements to Defendants, which eventually led to several prosecutions and convictions for perjury. Further, the complaint indicates that the only credible evidence indicated that another individual was responsible for the fire. Although the threatening text messages sent to David Terry were initially attributed to Plaintiff, it was later determined by the investigator working for Plaintiff that the text messages originated from a prepaid phone purchased in Westchester, New York by Edward Leon. Further, video from the pole cameras showed that Edward Leon was at the scene of the fire during the early morning of May 2, 2013, contrary to his previous testimony before the grand jury. *See* Dkt. No. 1 at ¶¶ 50-51.

In the order of dismissal, neither the Court nor the Government makes clear the exact reasons for dismissal and do not specifically refer to Plaintiff's guilt or innocence. Further, it is

not implied that the dismissal was out of mercy.  Nothing before the Court indicates that the reasons for dismissing the charge against Plaintiff are inconsistent with his innocence.  Moreover, the criminal case against Plaintiff was dismissed on February 7, 2014.  It is now four years later and no new criminal charges have been brought against Plaintiff relating to the fire.  Accordingly, the Court finds that Plaintiff has plausibly alleged that the criminal proceedings terminated in his favor.  *See Norton v. Town of Brookhaven*, 47 F. Supp. 3d 152, 161 (E.D.N.Y. 2014); *Verboys v. Town of Ramapo*, 12 A.D.3d 665, 666 (2d Dep't 2004) ("Here, although the initial criminal proceeding against the plaintiff Joseph Verboys was dismissed without prejudice, the record demonstrates that the prosecution undertook a full investigation and elected not to proceed with the charges because it determined that the allegations against the plaintiff were not supported by the evidence.  Thus, there was sufficient evidence in the record for the jury to conclude that the criminal proceedings terminated in favor of the plaintiff ") (citations omitted); *see also Stapmf*, 761 F.3d at 201; *Sosa v. City of New York*, 50 Misc. 3d 1203(A), *6 (N.Y. Sup. Ct. 2015); *Rohrs v. Rohrs*, 17 A.D.3d 659, 660 (2d Dep't 2005).

Although Plaintiff may not be able to satisfy his burden at summary judgment or trial as to this element, the complaint plausibly alleges favorable termination of the underlying criminal proceedings.  *See Ying Li v. City of New York*, 246 F. Supp. 3d 578, 610 n.26 (E.D.N.Y. 2017) (denying motion to dismiss because, although the prosecutor provided reasons for the dismissal of the criminal charges that would be inconsistent with the plaintiff's innocence, it would be "inappropriate for the Court to interpret articulated reasons given by the prosecutor as the real motivation for the government's dismissal of the case") (citations omitted).  As such, the Court denies Defendants' motions to dismiss on this ground.

### 3. Probable Cause

Probable cause, an element of a malicious prosecution claim, is "evaluated on the totality of the circumstances." *Jenkins v. City of New York*, 478 F.3d 76, 90 (2d Cir. 2007) (citation omitted).  In a malicious prosecution case, the timing of a probable cause determination is crucial. "Although the existence of probable cause must be determined with reference to the facts of each case, in general '[p]robable cause to arrest exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested.'"  *Manganiello*, 612 F.3d at 161 (quotation and other citations omitted). The Second Circuit has explained that

> [u]nder New York law, "even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause.' . . .  In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact. . . .  The New York Court of Appeals has noted that "the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause."

*Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) (quotations and other citations omitted).

In *Crews v. Cty. of Nassau*, 996 F. Supp. 2d 186 (E.D.N.Y. 2014), for example, the plaintiff was selected from a photo array by the victim.  *See id.* at 204-05.  Based on this identification, the court first held that there was probable cause to arrest the plaintiff.  *See id.* at 205-07.  The officer in charge of the case later learned that the plaintiff had been in jail at the time the crime occurred, but he did not seek to end the prosecution, which continued for several more months.  *See id.* at 208.  The court held that "the probable cause that existed based upon the [ ] identification [was] vitiated by the exculpatory evidence that plaintiff had been in jail at the time of the robbery."  *Id.*  As such, although the court found that the officers had probable cause to

arrest the plaintiff, probable cause no longer existed to continue the prosecution once this new information was discovered by the officer in charge of the investigation. *See id.*

In the present matter, the Court finds that Plaintiff has plausibly alleged that the Schenectady and ATF Defendants lacked probable cause to commence and continue the prosecution. The complaint plausibly alleges that Defendants questioned Duell on May 2, 2013 for approximately nine hours. *See* Dkt. No. 1 at ¶ 33. From approximately 12:45 p.m. until at least 5:00 p.m., Duell maintained that she had been with Plaintiff and Fish in Saratoga Springs the entire night. *See id.* Like Plaintiff, Duell almost immediately mentioned that Edward Leon was a possible suspect and explained why they suspected him, including the fact that Leon was suspected to have started a fire the week before at Bryanne Frolke's apartment. *See id.* This fact was also brought to Defendants' attention when Bryanne Frolke's father called the Schenectady Police Department to report that he believed that they had arrested the wrong person.

At some point during the interrogation, Duell eventually started to charge her story. She specifically told Defendants that she would do whatever it would take to see her only surviving child. Despite Duell's initial story, at approximately 6:45 p.m., she signed a sworn statement that she was present with Fish and another person when Plaintiff allegedly started the fire. *See id.* at ¶ 34.

In the following days, Duell again recanted her inculpatory statements, but law enforcement warned her against changing her story. On May 6, 2013, Duell again told Defendants that she remained in Saratoga Springs with Plaintiff and Fish and was not at the scene of the fire. Defendants, however, were not swayed and one interrogator stated as follows:

> You're not being honest with us, Jennica. We have all the video footage from the time you guys walk out of Broadway and get in the car you already told us about. From your voice being heard in the hallway to the point where you say two guys drag you in. We

> canvassed the whole neighborhood.  They see you getting dragged
> in the car.  Do not start lying now.  You start lying about this and
> you lie in front of a grand jury you will go to prison for the rest of
> your life and you will not see Sa'Fyre.

*Id.* at ¶ 42.  Despite these assertions, no such video existed and no one had reported hearing her voice at the scene.

Similarly, Fish initially maintained that he was in Saratoga Springs when interrogated by Defendants Stocklas, Hesch, and Maher.  *See id.* at ¶ 31.  Defendant Stocklas eventually told him that a newspaper reporter placed him at the scene and picked him out of a photo array and either Defendant Hesch or Defendant Maher told him that he would never see the light of day again. *See id.*  At one point, one of the Defendants mentioned that a Poland Spring water bottle was used to pour gasoline at the fire and, from that point forward, Fish incorporated this detail in several of his many statements.  As set forth in more detail above, in his many statements provided in the days following the fire, Fish changed many details of that evening, including the car that transported them to Schenectady, the route taken, and who had driven them.  When Duell and Fish provided these statements, Defendants knew that they had been drinking heavily on the night of the fire and had ingested LSD.  *See* Dkt. No. 1 at ¶ 31.

As set forth in more detail above, the complaint plausibly alleges that Defendants were presented with an ever evolving and changing story about an evening in which the only witnesses were intoxicated and high on LSD.  At this stage in the proceedings, the Court finds that Plaintiff plausibly alleges that Defendants lacked probable cause to initiate the criminal proceedings against him.

Moreover, even if Defendants may have had probable cause to arrest and commence the criminal proceedings, exculpatory facts became known immediately following the arrest that dissipated any such probable cause.  *See D'Angelo v. Kirschner*, 288 Fed. Appx. 724, 726 (2d Cir.

-34-

2008) (citation omitted).  In addition to the facts already discussed, Mike Barnes and Mindy Nokes continually stated that Plaintiff was with them in Saratoga Springs during the night of the fire.  Additionally, having already changed her story several times, in or around July of 2013, Duell publicly recanted her testimony in a story published in the Times Union.  *See* Dkt. No. 1 at ¶ 43.  Specifically, among other things, Duell stated as follows: "'I was telling cops whatever they wanted to hear so I could get home to Sa'fyre, even if that means I have to lie to be next to my daughter.  I would do anything to be by my child's side.  I'm sorry, but I'm a mother first.'"  *Id.* at ¶ 43 (quotation omitted).

Additionally, on January 2, 2014, Leon was confronted with the video surveillance from the pole cameras that depicted his two-toned van in the vicinity of the fire on May 2, 2013 and evidence that he had been the one who sent the threatening text messages to David Terry prior to the fire.  *See id.* at ¶¶ 50-51.  When confronted with this evidence by Defendants Hesch and Maher, Leon admitted that he was at the scene of the fire for the purpose of confronting Terry about his relationship with Brianne Frolke and further admitted that he sent the threatening text messages.  *See id.*  Despite this admission, the charges against Plaintiff were not dropped until February 7, 2014, more than one month later.  *See id.* at ¶ 50.

These facts are but a brief summary of the exculpatory evidence that Defendants were presented with following Plaintiff's arrest and the initiation of criminal proceedings against him. These facts plausibly suggest that the questionable nature of the charge against Plaintiff was made apparent by the discovery of this additional information.  *See Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996).

Based on the foregoing, the Court denies Defendants' motions to dismiss on this ground.

### 4. Malice

Generally, a lack of probable cause creates an inference of malice. *See Manganiello*, 612 F.3d at 163 (quotation and other citation omitted). "Further, 'malice may be shown by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff.'" *Id.* at 163-64 (quotation and other citations omitted).

In the present matter, the Court finds that Plaintiff has plausibly alleged that Defendants acted with malice. In addition to the lack of probable cause discussed above, malice can be inferred based on Defendants' continued focus on Plaintiff, to the exclusion of all other suspects, in the face of mounting exculpatory evidence. *See id.* at 164.

Based on the foregoing, the Court denies Defendants' motions to dismiss on this ground.

### 5. Qualified Immunity

Both the ATF and the Schenectady Defendants contend that they are entitled to qualified immunity as to the malicious prosecution claim because "arguable probable cause" existed. *See* Dkt. No. 23-1 at 11-15; Dkt. No. 28-2 at 17-18.

Pursuant to the doctrine of qualified immunity, a police officer may still avoid liability even if his actions did not conform to constitutional standards where "'(1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was "objectively reasonable" for him to believe that his actions were lawful at the time of the challenged act.'" *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007) (quotations omitted). In determining whether an officer is entitled to qualified immunity for a probable cause determination, the court must decide whether the officer had arguable probable cause. *See Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010). "'Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause

existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" *Id.* (quoting *Walczyk v. Rio*, 496 F.3d 139, 163 (2d Cir. 2007)). The arguable probable cause standard is "more favorable to the officers" than the ordinary standard used to determine probable cause. *See Ackerson v. City of White Plains*, 702 F.3d 15, 21 (2d Cir. 2012) (citation omitted).

On a motion to dismiss, however, a qualified immunity defense based on arguable probable cause "'faces a formidable hurdle ...' and is usually not successful." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 191-92 (2d Cir. 2006) (quoting *McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004)). This case is no exception. In support of qualified immunity, Defendants merely summarize their version of the facts and assert that their actions were objectively reasonably and not patently incompetent. At the summary judgment stage, they will have the opportunity to try to demonstrate this by submitting evidence showing that reasonably competent officers in their situation could have at least disagreed on whether probable cause existed. Based solely on the complaint, however, the Court cannot conclude that this must have been the case.

Based on the foregoing, the Court denies Defendants' motion to dismiss on this ground.

**E.      Conspiracy Claims Pursuant to 42 U.S.C. § 1983**

"'To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.'" *D.K. by L.K. v. Teams*, 260 F. Supp. 3d 334, 363 (S.D.N.Y. 2017) (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)). "And, 'complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his [or her] constitutional rights are properly dismissed and expansive allegations are

insufficient, unless amplified by specific instances of misconduct.'" *Id.* (quoting *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002)) (other quotation omitted). Allegations of direct evidence of conspiracy are not necessary, as conspiracies have long been recognized to be secretive by nature and often are proven by circumstantial evidence, *see Pangburn*, 200 F.3d at 72, though detailed allegations of the conspiracy's time and place are helpful to cross the plausibility threshold, *Ciambriello*, 292 F.3d at 325. "'For claims of § 1983 ... conspiracies to survive a motion to dismiss, the plaintiff must provide some factual basis supporting a meeting of the minds.'" *Teams*, 260 F. Supp. 3d at 363 (quoting *Biswas v. City of New York*, 973 F. Supp. 2d 504, 533 (S.D.N.Y. 2013)).

In the present matter, the Court finds that the complaint fails to adequately state a claim of conspiracy to deprive Plaintiff of his federal rights because it does not adequately allege that Defendants agreed or had a meeting of the minds to deprive him of such rights. While Plaintiff has adequately pled deprivations of his federal rights by the ATF and Schenectady Defendants sufficient to state liability under section 1983, the claims of concerted conduct are considerably more sparse, and are generally limited to particular incidents of abuse in which multiple persons participated. The complaint, however, does not go beyond that to support his claim of a conspiracy.

In his response to Defendants' motions, Plaintiff argues that the fact that Defendants interviewed witnesses, disregarded protestations of innocence by Plaintiff, disregarded potentially exculpatory evidence, and shared information gained during their investigation with one another is indicative of a conspiracy to deprive Plaintiff of his civil rights. These allegations, however, fall short of the necessary facts sufficient to establish a meeting of the minds and an express or implied agreement to act in concert. Courts have regularly found that such broad and conclusory

allegations are insufficient to withstand a motion to dismiss.  *See Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (affirming district court's dismissal of conspiracy claim as baseless where the plaintiff "offer[ed] not a single fact to corroborate her allegation of a 'meeting of the minds' among the conspirators"); *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 209-10 (S.D.N.Y. 2013) (citing cases).

Based on the foregoing, the Court grants the ATF and the Schenectady Defendants' motions to dismiss Plaintiff's section 1983 conspiracy claim.

**F.    Conspiracy Claims Pursuant to 42 U.S.C. §§ 1981 and 1985**

Plaintiff lists 42 U.S.C. §§ 1981 and 1985 in Count 1 of his complaint.  *See* Dkt. No. 1. "Section 1981 prohibits race-based discrimination in the creation and enforcement of contracts." *McKnight v. Middleton*, 699 F. Supp. 2d 507, 529 (E.D.N.Y. 2010) (citations omitted).  To state a claim under section 1981, the plaintiff must allege facts supporting the following three elements: (1) he is a member of a racial minority; (2) an intent to discriminate on the basis of his race by defendant; and (3) the discrimination concerned one or more activities enumerated in section 1981, *i.e.*, the creation and enforcement of contracts.  *See id.* (citations omitted).  Similarly, section 1985(3) "permits the recovery of damages against persons who conspire to violate a plaintiff's civil rights."  *Id.* at 531 (citation omitted).  A conspiracy brought pursuant to section 1985(3) must, among other things, "be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action."  *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007).  Since none of the allegations in the complaint discuss racial discrimination or the formation of contracts, these claims are clearly subject to dismissal.

Additionally, section 1985(1) relates to conspiracies to interfere with a federal official in the performance of his or her duties.  *See Trayer v. Klopfenstein*, No. 3:13-cv-2581, 2014 WL 3543779, *6 (N.D. Ohio July 16, 2014) (citing cases discussing the limited scope of 42 U.S.C. § 1985(1)).  Again, this provision has no relevance to the present matter.

Finally, the Court notes that section 1985(2) contains two clauses prohibiting distinct conspiratorial conduct.  The first clause prohibits interference with federal court proceedings, while the second clause prohibits interference with state court proceedings, with the intent to deny an individual equal protection of the laws.  *See* 42 U.S.C. § 1985(2); *Keating v. Carey*, 706 F.2d 377, 379 (2d Cir. 1983).  As such, only the first prong could arguably be applicable to the present matter.  To state a claim under the first clause of section 1985, however, a plaintiff must plead a conspiracy between two or more persons to: (1) "deter, by force, intimidation, or threat, any party or witness ... from attending [federal] court, or from testifying to any matter pending therein, freely, fully, and truthfully"; (2) "injure such party or witness in his person or property on account of his having so attended or testified"; (3) "influence the verdict, presentment, or indictment of any grand or petit juror in any such court"; or (4) "injure such juror ... on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror." 42 U.S.C. § 1985(2).

First, Plaintiff does not allege that any Defendant sought to deter any witness "by force, intimidation, or threat" from attending or testifying to any matter freely, fully, and truthfully. Second, Plaintiff has not alleged that any of the Defendants conspired to injure him or any witness for having attended federal court or for having testified in federal court.  Third, the complaint fails to plausibly allege that any of the Defendant conspired to influence presentment or indictment of any grand jury.  Fourth, Plaintiff does not allege that Defendants conspired to injure

-40-

a juror in connection with any such proceedings.  Accordingly, any claim that Plaintiff may be

seeking to allege under the first clause of section 1985(2) must fail.  Finally, even assuming that

Plaintiff intended to bring a cause of action under section 1985(2), the claim is still subject to

dismissal because, as discussed above, Plaintiff has failed to plausibly allege the requisite meeting

of the minds by Defendants.

Based on the foregoing, to the extent that Plaintiff was attempting to assert claims based

on 42 U.S.C. §§ 1981 and 1985, those claims are dismissed.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the

applicable law, and for the reasons set forth above, the Court hereby

**ORDERS** that the ATF Defendants' motion to dismiss (Dkt. No. 23) is **GRANTED in

part and DENIED in part**; and the Court further

**ORDERS** that the Schenectady Defendants' motion for judgment on the pleadings (Dkt.

No. 28) is **GRANTED in part and DENIED in part**;[2] and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision

and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: February 15, 2018
      Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[2] As a result of this Memorandum-Decision and Order, the only remaining claim is Plaintiff's malicious prosecution claim against all Defendants.