**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**ROBERT BUTLER,**

                        **Plaintiff,**

      **vs.**                                    **1:16-cv-1540**
                                                  **(MAD/CFH)**

**ERIC HESCH,** _City of Schenectady Police Detective_;
**THOMAS DISBROW,** _Former City of Schenectady_
_Police Detective_; **PAUL STEELE,** _Former City of_
_Schenectady Police Detective_; **MARK MEEKS,**
_United States Bureau of Alcohol, Tobacco, Firearms,_
_and Explosives Special Agent_; **MARK MAHER,**
_United States Bureau of Alcohol, Tobacco, Firearms,_
_and Explosives Special Agent_; **and JASON**
**STOCKLAS,** _United States Bureau of Alcohol,_
_Tobacco, Firearms, and Explosives Special Agent_,

                            **Defendants.**

_____

**APPEARANCES:**                     **OF COUNSEL:**

**GETZ & BRAVERMAN, P.C.**     **RAYMOND E. GAZER, ESQ.**
172 East 161st Street
Bronx, New York 10451
Attorneys for Plaintiff

**NAPIERSKI, VANDENBURGH,**    **SHAWN F. BROUSSEAU, ESQ.**
**NAPIERSKI & O'CONNOR, LLP**   **DIANE LUFKIN SCHILLING, ESQ.**
296 Washington Avenue Extension    **THOMAS J. O'CONNOR, ESQ.**
Albany, New York 12203           **RONNIE SILLS LINDBERG, ESQ.**
Attorneys for Defendants Hesch,
Disbrow, and Steele

**OFFICE OF THE UNITED**        **KAREN FOLSTER LESPERANCE, AUSA**
**STATES ATTORNEY**
James T. Foley U.S. Courthouse
445 Broadway, Room 218
Albany, New York 12207-2924
Attorneys for Defendants Meeks,
Maher, and Stocklas

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I. INTRODUCTION

Plaintiff commenced this action on December 28, 2016, pursuant to 42 U.S.C. §§ 1983 and 1985, and *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), complaining of constitutional and civil rights violations stemming from Plaintiff's arrest and detention. *See* Dkt. No. 1. In a February 15, 2018 Memorandum-Decision and Order, the Court granted in part and denied in part Defendants' motions to dismiss. *See* Dkt. No. 33. As a result of that decision, the only remaining claim is Plaintiff's malicious prosecution claim against all named Defendants. *See id.*

Currently before the Court are Defendants' motions for summary judgment. *See* Dkt. Nos. 83 & 84.

## II. BACKGROUND

### A.    The Fire

This litigation arises out of an appalling, intentionally-set fire that occurred in the early morning hours of May 2, 2013, at 438 Hulett Street, Schenectady, New York. *See* Dkt. No. 87-7 at ¶ 1. Residing on the second floor of the residence at the time of the fire were Jennica Duell and her four young children, David Terry (Duell's ex-boyfriend and father of the four children), Christopher Urban, and Elshaquan Miller. *See id.* at ¶ 2. David Terry and three of the children perished in the fire, while the fourth child survived with devastating burn injuries. *See id.* at ¶¶ 3-4. Jennica Duell was not in 438 Hulett Street at the time of the fire. *See id.* at ¶ 5.

An immediate investigation into the cause and origin of the fire was conducted by Special Agents of the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). *See id.* at ¶ 6. The presence of an accelerant in the front hallway of the residence was quickly

confirmed and a conclusion reached that there was cause to believe that the fire was intentionally set. *See id.* at ¶ 7.

## B.    Neighborhood Canvass – May 2, 2013

The investigation into the circumstances of the fire was initially headed by the Schenectady County District Attorney's Office and the Schenectady Police Department, with the ATF in a supportive role. *See* Dkt. No. 87-7 at ¶ 8. Within the first several days, however, the District Attorney's Office and the United States Attorney's Office for the Northern District of New York determined that it would become a federal investigation. *See id.* at ¶ 9.

Initially, members of the Detectives Unit of the Schenectady Police Department conducted a neighborhood canvass seeking any information about the origin of or the circumstances surrounding the fire. *See id.* at ¶ 10. The canvass produced three (3) neighbors who independently stated that they heard Jennica Duell's voice outside 438 Hulett Street at about the time the fire started: Tina Daniels, Peter Krom, Jr., and Jennifer Archambault. *See id.* at ¶ 11.

Tina Daniels lived two doors down from 438 Hulett Street and had known Jennica Duell for five (5) years. *See id.* at ¶ 12. In relevant part, Ms. Daniels stated as follows:

> Early this morning I was asleep in my bedroom which is off the living room. My bedroom is on the same side as Daves [sic] house which is two doors down. I had my window cracked open a little bit. I woke to a voice yelling fire, and when I heard fire screamed a second time I knew it was Jennica's voice.

*Id.* at ¶ 13.

Peter Krom, Jr. and Jennifer Archambault, lived together in the first floor of 438 Hulett Street. *See id.* at ¶ 14. Mr. Krom stated, in relevant part,

> I live in the first floor of 438 Hulett St. with my girlfriend, Jenn Archambault, and several other people. On 5/02/13 at approximately 4:30a.m., I got out of bed to go to the bathroom. I

could hear the second floor tenants arguing on the stairway that lead [sic] to the second floor.  I heard Jennica saying "No, No, No."  I could hear a male's voice yelling back at her.  I went back to bed and heard a glass smash near the front door porch.

*Id.*  Ms. Archambault further provided the following account:

> I was in my downstairs bedroom sleeping, my bedroom is actually the living room which was made into a bedroom and is located in the front of the house near the front door.  I was sleeping with my boyfriend Peter Krom, Jr., when around 4:30 a.m. I was awoken by arguing coming from the front porch stairwell; it was loud enough to wake me up.  I heard the upstairs tenant, Jennica ... and a male voice which I didn't recognize.  I really didn't hear what was being said but I did hear Jennica saying "no, no, no."  After she said that I heard a glass smash and that made me get up.  I actually was going to curse out Jennica because this happens all the time.
>
> * * *
>
> While we were outside, maybe 20 minutes later, I overhead a lady saying that she saw Jennica running down the street yelling "fire."  I do not know who the lady was or even what she looked like; I was too upset to pay that much attention.

*Id.* at ¶ 15.

## C.    Jennica Duell – May 2, 2013

On May 2, 2013, Schenectady Police Detectives Steele and Disbrow questioned Jennica Duell about the fire earlier that morning.  *See* Dkt. No. 87-7 at ¶ 16.  Duell was advised of her *Miranda* rights and signed a written acknowledgment that she understood these rights.  *See id.* at ¶ 17.

Initially, Duell stated that she, Plaintiff, and Bryan Fish were in Saratoga on May 1st and May 2nd.  *See id.* at ¶ 18.  Duell insisted that they all slept at Mike Barnes' and Mindy Sherman's Saratoga apartment until around 9:00 a.m., then went to a local Stewart's where they learned about the fire from a television report.  *See id.* at ¶ 19.  Duell also indicated that David Terry, the adult

-4-

victim in the fire, was trying to control her life and that Plaintiff was angry with Terry for trying to keep her and Plaintiff apart. *See id.* at ¶ 20. Duell claimed that David Terry had kicked Plaintiff out of the Hulett Street apartment a short time before the fire because Terry thought that Plaintiff was physically abusing Duell. *See id.* at ¶ 21. Duell stated that she told Plaintiff that if he wanted to be with her, he would have to accept Terry because Terry was her best friend. *See id.* at ¶ 22. According to Duell, Plaintiff threatened that "if I left him he'd kill me." *Id.* at ¶ 23. Duell also claimed, however, that she thought Plaintiff's threat was a joke and informed the detectives that he never threatened to burn down the house. *See* Dkt. No. 96-10 at ¶ 23.

After her initial denials, Detective Steele advised Duell that three neighbors had identified her voice, arguing with a male outside 438 Hulett Street, at about the time the fire was started. *See* Dkt. No. 87-7 at ¶ 24. Further, Detectives Steele and Disbrow advised her that she was heard to be yelling "No, No, No" by neighbors who knew her and recognized her voice. *See id.* at ¶ 25. Initially, even after being confronted with witnesses who allegedly heard her voice at the scene of the fire, Duell continued to claim that neither she, Plaintiff, nor Fish left Saratoga on the night of the fire. *See* Dkt. No. 96-10 at ¶ 26 (citing Transcript of May 2, 2013 Interview of Jennica Duell ("Duell Tr.") at 113-16). After Detectives Steele and Disbrow continued to suggest that Duell was attempting to prevent Plaintiff from starting the fire, Duell eventually stated that she would tell the interviewers what they wanted to hear for the sake of her children. *See id.* at ¶ 26.

At this point, Duell admitted that she was at the scene of the fire with Plaintiff and Fish, and that Plaintiff had started the fire. *See* Dkt. No. 87-7 at ¶ 26. Duell then provided additional detail about the alleged trip to Schenectady, Plaintiff's starting of the fire, and the trip back to Saratoga. *See id.* at ¶ 27. For example, Duell claimed that she went with Plaintiff and Fish to Schenectady in a car that "looked like a red Saturn" that was driven by Plaintiff's friend. *See*

Duell Tr. at 116-17. Duell also claimed that, while en route to Schenectady, Plaintiff struck her, burned her with a cigarette, and hit her in the head. *See id.* at 129, 131-33.[1] With respect to actually setting the fire, Duell initially said that she did not see Plaintiff light anything, but that he had a lighter and something else in his hand. *See id.* at 119, 132. Duell claimed that when they arrived at the house, Plaintiff ran into the house while she was pulled back into the vehicle, preventing her from seeing what exactly transpired next. *See id.* at 131-35. Despite being in the vehicle, Duell indicated that she was able to see Plaintiff "light something." *Id.* at 135. Duell then provided the detectives with additional details regarding their trip to and from Schenectady on May 2, 2013. *See id.* at 134-44.

Shortly thereafter, Detective Steele left the interview. *See id.* at 148. Detective Disbrow continued the discussion with Duell and prepared a detailed typewritten affidavit for her to review and execute. *See* Dkt. No. 87-7 at ¶ 29. Before drafting Duell's affidavit, Detective Disbrow read her the typewritten acknowledgment at the beginning of the affidavit, stating that she understood that any false statements in the affidavit were punishable as misdemeanors. *See id.* at ¶ 30. Detective Disbrow proceeded to type Ms. Duell's sworn statement, reading portions to her as he went along, obtaining her agreement each time. *See id.* at ¶ 31. When the statement was completed, Detective Disbrow read the complete statement to Duell, at her request, which she then initialed and signed. *See id.* at ¶ 32. Thereafter, Duell signed a "Consent to Search" and relinquished her clothes to Detective Disbrow for further examination. *See id.* at ¶ 33. Detective Disbrow arranged for Duell's mother to accompany officers to pick up clothes for Duell. *See id.* at ¶ 34. Detective Disbrow then assured Duell that he would bring her to her mother's home. *See*

---

[1] During a May 6, 2013 interview with Detectives Hesch and Steele, Duell would attribute the burn and bruising to an unrelated physical and sexual assault that occurred a day or two before the fire.

*id.* at ¶ 35. Duell thanked Detective Disbrow for the way she was treated during the questioning. *See id.* at ¶ 36.

**D.     Robert Butler – May 2, 2013**

On May 2, 2013, Detectives Steele and Disbrow also interviewed Plaintiff Robert Butler. *See* Dkt. No. 87-7 at ¶ 37. Plaintiff was advised of his *Miranda* rights and signed a written acknowledgment that he understood these rights. *See id.* at ¶ 38. During the interview, Plaintiff steadfastly denied leaving Saratoga in the early morning hours of May 2, 2013, insisting that he, Duell, and Fish spent the night in Saratoga and only learned of the fire at the local Stewart's store. *See id.* at ¶ 39. Plaintiff stated that they took a taxi back to Schenectady after learning about the fire. *See id.* at ¶ 40.

While Plaintiff was alone in the interview room, he stated the following: "I didn't want to do it, Jennica. The kids, oh, my God." *Id.* at ¶ 41; Transcript of May 2, 2013 Interview of Robert Butler ("Butler Tr.") at 2.[2] Subsequently, Plaintiff invoked his right to counsel and the questioning immediately stopped. *See id.* at ¶ 42.

**E.     Bryan Fish – May 2, 2013**

On May 2, 2013, Detective Eric Hesch interviewed Bryan Fish who he understood had been in Saratoga Springs with Robert Butler and Jennica Duell on May 1, 2013, the day before the Hulett Street fire. *See* Dkt. No. 87-7 at ¶ 43. Prior to questioning Fish about his activities on May 1, 2013 and the early morning hours of May 2, 2013, Detective Hesch advised Fish of his

---

[2] The Court notes Plaintiff denies this fact and claims that "[i]t is unclear that Butler said exactly that phrase." Dkt. No. 96-10 at ¶ 41. The Court has reviewed the recording of this interview and it is clear that Plaintiff stated what was reported in the transcript of the interview. *See* Dkt. No. 88, Exhibit A(2) at 02:25-02:35.

*Miranda* rights and obtained his written acknowledgment that he understood these rights. *See id.* at ¶ 44.

Initially, Fish stated that he was with Plaintiff and Jennica Duell on May 1, 2013, in Saratoga Springs. *See id.* at ¶ 45. Fish stated that he, Plaintiff, and Duell spent the night at the apartment of Plaintiff's friends, Mike Barnes and Mindy Sherman. *See id.* at ¶ 46. Fish stated that the three learned of the Hulett Street fire at a local Stewart's store where they went to get something to eat after waking up that morning. *See id.* at ¶ 47. At this point, Fish claimed that the three of them took a taxi to Schenectady. *See id.* at ¶ 48.

Shortly after initial questioning, Detective Hesch left the room to speak with the detectives who had questioned Plaintiff. *See id.* at ¶ 49. He also advised Fish that detectives were, at that time, speaking with Duell. *See id.* at ¶ 50.

After leaving Fish, Detective Hesch learned that, during her interview with Detectives Steele and Disbrow, Duell had admitted to coming to Schenectady with Plaintiff and Fish and watched Plaintiff set the Hulett Street fire. *See id.* at ¶ 51. Upon returning to the interview room, Detective Hesch advised Fish what Duell had told Detectives Steele and Disbrow. *See id.* at ¶ 52. Subsequently, Detective Hesch again left the interview room to hear more of Duell's interview and spoke to Detective Steele regarding the details of Duell's statements. *See id.* at ¶ 53. While Fish was alone in the interview room, he clearly indicated that he did not believe Detective Hesch regarding what Duell had said. *See id.* at ¶ 54. Specifically, Fish was recorded stating the following: "He didn't talk to Jennica. She didn't say that. I know 'cause he's fucking lying. They do this all the time." *Id.*

During Detective Hesch's questioning, Fish was allowed to visit with his sister and his mother. *See id.* at ¶ 55. During his conversation with his mother, Fish stated that Plaintiff and

-8-

Duell "probably did" go to Schenectady and start the fire but that he did not know, adding, "I don't want to be a witness." *Id.* at ¶ 56.

Subsequently, ATF Agent Stocklas joined the interview and Detective Hesch left. *See id.* at ¶ 57. For most of the interview, Fish adamantly denied being in Schenectady in the early morning hours of May 2, 2013, or having any knowledge of how the fire was started. *See* Dkt. No. 96-10 at ¶ 58; *see also* Transcript of May 2, 2013 Interview of Bryan Fish ("Fish Tr.") at 142-214. Eventually, however, Fish made the following concession: "If I was there, I was blacked out because all I remember last night was going downstairs and going to sleep. That's it. I swear to God. I swear on my niece. I swear on everything I love, that's all I remember." Fish Tr. at 213. When Detective Hesch and Agent Stocklas expressed their disbelief in Fish's story, Fish stated that "[i]f I was in your shoes, I wouldn't believe me either." *Id.* at 246.

Later on in the interview, when Detective Hesch returned to the room, Fish stated that things were "coming back" to him. *See* Dkt. No. 87-7 at ¶ 61. Fish also indicated that if he was given some "[s]our diesel," which he described as "[v]ery very strong marijuana," he would "probably blurt out everything." Fish Tr. at 287. Fish then asked for some time to think and Agent Stocklas and Detective Hesch left the room. *See* Dkt. No. 87-7 at ¶ 63. When Agent Stocklas and Detective Hesch returned, Fish admitted that he, Duell, and Plaintiff were driven to Schenectady by a friend of Plaintiff and that he and Duell watched Plaintiff set 438 Hulett Street on fire. *See id.* at ¶ 64. Following a discussion with Fish regarding additional details, Detective Hesch prepared a sworn statement, which Fish reviewed, initialed, and signed. *See id.* at ¶ 65.

## F. Federal Investigation

Within a few days of the May 2, 2013 fire, Detective Hesch was advised by Assistant Chief Leguire that the investigation was being taken over by the United States Attorney's Office.

*See* Dkt. No. 87-7 at ¶ 66. Assistant Chief Leguire also informed Detective Hesch that he was being temporarily "loaned" to the federal investigation to work with the United States Attorney's Office and federal ATF agents. *See id.* at ¶ 67. Thereafter, the federal investigation was closely supervised by then First Assistant United States Attorney Grant Jaquith and Assistant United States Attorney ("AUSA") Wayne Meyers. *See id.* at ¶ 68. Detective Hesch and the ATF agents working on the fire investigation frequently met with AUSAs Jaquith and Meyers and took instruction from them with respect to the direction and details of the investigation. *See id.* at ¶¶ 69-70.

## G.      Bryan Fish – May 5, 2013

On May 5, 2013, Detective Hesch re-interviewed Bryan Fish at the Schenectady Police Department. *See* Dkt. No. 87-7 at ¶ 71. Fish indicated that he remembered some additional details of the events of May 2, 2013, leading up to the Hulett Street fire. *See id.* After discussing the matter with Fish, Detective Hesch prepared a sworn statement for Fish to review and execute. *See id.* at ¶ 72.

In his statement, Fish first recounted the various substances he, Plaintiff, and Duell had taken throughout the day and evening of May 1, 2013, before falling asleep in the Saratoga apartment in which they were all spending the night. *See* Dkt. No. 87-4 at 23-24. At some point after falling asleep, Fish recalled being woken up by Plaintiff, who informed him that they were going to "Dave's" house to fight him. *See id.* at 24. After recounting various details about how they got from Saratoga to Schenectady, Fish stated that when they arrived at Hulett Street, Plaintiff removed a small red gas can from the trunk of the vehicle and poured some gas into a Poland Springs water bottle. *See id.* At this point, Fish claims that Plaintiff and the driver of the vehicle approached the house. *See id.* at 24-25. After Plaintiff entered the home, Fish approached

-10-

thinking that the fight was about to begin. *See id.* at 25. Standing outside the house, Fish claimed that he observed Plaintiff pour gas from the bottle on the floor and stairs inside the house, which he then lit with a Zippo lighter that Plaintiff had earlier gotten from Duell. *See id.* At this point, Fish claims that Duell started "screaming fire" and that he and the driver had to force Duell back into the vehicle. *See id.* Fish concludes his statement by recalling their returning trip to Saratoga and eventual return to Schenectady later in the day on May 2, 2013. *See id.* at 25-26.

The ATF and U.S. Attorney's Office worked together to subpoena cellular telephone records from all individuals associated with 438 Hulett Street or potentially connected to the fire, and to analyze those records. *See* Dkt. No. 85-2 at ¶ 16. Among other things, forensic analysis of Fish's cellular telephone revealed a text message sent by Fish on April 29, 2013, saying "get ahold of [name omitted] because robs [sic] about to go to [S]chenectady to split some wigs." *Id.* at ¶ 17. A little later, Fish sent another text message stating that "Rob wants to kill [C]hris and his two friends for fucking with his and [J]ennicas [sic] life she is going to get violated on probation [a]nd go to prison [a]nd loose [sic] the kids he is on the verge of flipping." *Id.* Law enforcement believed that the reference to "Chris and his two friends" is a reference to Christopher Urban, David Terry, and Elshaquan Miller. *See id.*

## H.     Mike Barnes and Mindy Sherman – May 5, 2013

On May 5, 2013, Detective Steele, Detective Disbrow, and ATF Agent Mayo interviewed Michael Barnes and Melinda ("Mindy") Sherman regarding the activities of Plaintiff, Duell, and Fish on May 1-2, 2013. *See* Dkt. No. 87-7 at ¶ 73. Detective Disbrow interviewed Barnes and Detective Steele interviewed Sherman. *See id.* at ¶ 74.

In his affidavit, Barnes stated that on the night of May 1, 2013, Duell and Plaintiff were "high on something" and that "Jennica mentioned that she had smoked crack in Sch'dy and had

taken Xanex [sic];" and that "Rob was snorting Hydro's [sic] in our house." *Id.* at ¶ 75. Barnes

stated further that

> Rob was saying that he had to get Jennica out of there
> (Schenectady) because "Dave" had threatened to kill her and the
> kids. Rob came across and said that Jennica told him that. Rob had
> said that he would never let that happen because he would get Dave
> first. The way that I know Rob, he is a nut case and he would do
> what he said he would, definitely capable of doing it. From what I
> saw of Jennica, she would do it to [sic].
>
> * * *
>
> Earlier I also remember that when Rob was talking about getting
> Dave first, Jennica was all for it. She was saying he was abusive,
> that Dave has hit her and Rob had said that he hates Dave and hes
> [sic] threatened Dave in the past.
>
> Also, when he was asking me for money for bus fare, Rob was
> using Brians [sic] phone to call people.

*Id.* at ¶ 76; *see also* Dkt. No. 87-2 at 22-24.

Mindy Sherman also provided an affidavit on May 5, 2013, which provides, in relevant

part, as follows:

> Rob had a couple of beers and they talked about doing drugs. Rob
> said him and Jennica were going to snort some "Hydros." Mike told
> them not to in the house so Rob and Jennica left and went outside. I
> think that is when they snorted the "Hydros".
>
> * * *
>
> I want to tell you more about the conversation we had when we
> were all hanging out. Jennica was saying that Dave was a piece of
> shit and she wanted Rob to "take care of Dave" and get the kids.
> Rob then asked me if I could keep the kids here. While Rob was
> asking me this Jennica kept saying how Dave was abusing her and
> hitting her and that Dave made her take drugs. She kept telling Rob
> to "take care of it" over and over.

*Id.* at ¶ 77; *see also* Dkt. No. 87-2 at 27-29.

**I.     Jennica Duell – May 6, 2013**

On May 6, 2013, Duell was interviewed again by Detectives Steele and Hesch and ATF
Agent Maher.  *See* Dkt. No. 87-7 at ¶ 78.  Duell was advised of her *Miranda* rights and signed an
acknowledgment that she understood her rights.  *See id.* at ¶ 79.

Early in the interview, Duell reverted to her initial position that neither she, Plaintiff, or
Fish ever left Saratoga the night of the fire.  *See id.* at ¶ 80.  Upon further inquiry, she explained
that she attempted to change her statement because she was afraid of retaliation from Plaintiff's
family.  *See id.* at ¶ 81.  Duell also changed her earlier statement that it was "a mulatto" person
who drove the three to Schenectady.  *See id.* at ¶ 82.  Rather, she stated that it was "Rob's friend
Ricky" who drove them.  *See id.*  Eventually, Duell admitted that she did "do acid" on the night of
May 1, 2013, which she had denied earlier in the interview.  *See id.* at ¶ 83.  Duell also stated that
she "did a little bit of 'Tussin,'" which Detective Steele assumed was a reference to the cough
medicine Robitussin.  *See id.* at ¶ 84.  She stated that, although Plaintiff brought acid for both of
them, she took it all because Plaintiff complained that he was sick to his stomach.  *See id.* at ¶ 85.
Further, Duell informed the officers that Plaintiff had smoked crack cocaine outside of Mike and
Mindy's apartment that night.  *See id.* at ¶ 86.

Regarding the trip to Schenectady, Duell stated that Ricky's car smelled like it had just
been sprayed with "a lavender spray."  *Id.* at ¶ 87.  She indicated that she had an allergy to
lavender and recalled opening the car window because "it was bothering my breathing."  *Id.* at ¶
88.  Duell stated further that, on the trip to Schenectady, they stopped at a blue or gray barn or
garage, about twenty minutes from Saratoga.  *See id.* at ¶ 89.  She then identified the bar from a
photograph obtained during the investigation.  *See id.*  Duell also identified 438 Hulett Street from
a photograph and marked where she, Plaintiff, and Fish were positioned at the time Plaintiff

started the fire. *See id.* at ¶ 90. Duell also stated that before they left for Schenectady early that morning, and when they got back, Plaintiff reminded her and Fish of their alibi, *i.e.*, they never left the apartment of Mike and Mindy in Saratoga. *See id.* at ¶ 91.

During the interview, Duell called and spoke with her mother, assuring her that she was fine. *See id.* at ¶ 92. Duell advised her mother that Detective Steele would arrange to bring her to the hospital and thereafter to her mother's house. *See id.* at ¶ 93. At the conclusion of the interview, Detective Steele typed a statement for Duell to review and sign, attaching photographs of the blue or gray barn and the marked photograph of 438 Hulett Street. *See id.* at ¶ 95.

## J.     Edward Leon – June 19, 2013

On June 19, 2013, as part of the federal investigation, Detective Hesch interviewed Edward Leon regarding his relationship with Brianne Frolke and his activities on May 1-2, 2013. *See* Dkt. No. 87-7 at ¶ 96. Leon stated that he dated Frolke for about four years when Frolke started seeing David Terry in January or February of 2013. *See id.* at ¶ 97. Leon stated that he was attempting to try to win her back. *See id.* Leon further stated that in February or March, he had a telephone conversation with Dave Terry in which he asked him to back off so that he could win Frolke back. *See id.* at ¶ 98. Leon further stated that on St. Patrick's Day, there was a fire in the basement at Frolke's house, which the fire department concluded was an electrical fire. *See id.* at ¶ 99.

Leon indicated that on May 1-2, 2013, he was working for Quandt's in Amsterdam, New York. *See id.* at ¶ 100. He stated that he arrived at work shortly before 5:00 a.m., after stopping for coffee at Cumberland Farms in Palatine Bridge. *See id.* He claimed to have worked that day until 3:00 or 3:30 p.m. *See id.* at ¶ 101. Detective Hesch subsequently confirmed with Leon's employer that he punched in on their electrical time clock at 4:48 a.m. on May 2, 2013. *See id.* at

¶ 102.  Additionally, after the interview, Special Agent Meeks attempted to confirm Leon's alibi by, among other things, obtaining employment records and time cards, and reviewing security camera footage from the Cumberland Farms where Leon said he purchased coffee that morning. *See* Dkt. No. 85-3 at ¶ 53.  On August 30, 2013, Special Agent Meeks identified on that footage a white male matching Leon's description and wearing a Quandt's uniform enter the store at 4:19:52, and leave with coffee at 4:21:33.  *See id.* at ¶ 54.  Special Agent Meeks input the Cumberland Farms address and Quandt's address into Google Maps, which indicated that travel time between the two locations was approximately twenty-nine (29) minutes, which supported Leon's alibi.  *See* Dkt. No. 85-2 at ¶ 42.

At the time of the June 19, 2013 interview, Detective Hesch did not consider Leon to be a suspect in the case.  *See* Dkt. No. 87-7 at ¶ 103.  Rather, Detective Hesch felt that the available evidence pointed toward Plaintiff as the individual responsible for starting the May 2, 2013 fire. *See id.* at ¶ 104.  However, the federal investigation subsequently revealed that Leon was, in fact, in the area of the Hulett Street fire on May 2, 2013, at around the time the fire was started.  *See id.* at ¶ 105.  The investigation also revealed that Leon had sent David Terry threatening messages shortly before the fire.  *See id.* at ¶ 106.

On October 24, 2013, Brianne Frolke met with the federal prosecutors.  *See* Dkt. No. 85-2 at ¶ 43.  While her May 5 statement said that she was not sure what time Leon awoke the morning of May 2, 2013, in October she said that she believed his alarm went off around 3:00 a.m. and further indicated that Leon texted her at 3:46 a.m. to say good morning.  *See id.* (citing Dkt. No. 85-66).  Based on this new timeline, on October 25, 2013, Special Agent Meeks looked again at the Cumberland Farms security camera footage for earlier in the morning of May 2, 2013, and identified an individual matching Leon's description entering Cumberland Farms at 3:24 a.m.  *See*

*id.* Detective Hesch then confirmed that the individual was Leon and Special Agent Meeks later confirmed that the individual he first believed to be Leon was one of Leon's co-workers at Quandt's. *See id.*

Leon eventually admitted that he had lied about these matters in his prior sworn statement and in his grand jury testimony. *See* Dkt. No. 87-3 at ¶ 107. Leon was later convicted of perjury following a jury trial and sentenced to a term of imprisonment. *See id.*

## K. Nicole Ragone – June 20, 2013

On June 20, 2013, as part of the federal investigation, Detective Hesch interviewed Nicole Ragone, a former girlfriend of Jennica Duell. *See* Dkt. No. 87-7 at ¶ 108. Ragone reported a conversation with Duell, a short time after the fire, in which Duell admitted coming to Schenectady with Plaintiff and Fish and seeing Plaintiff start the fire:

> [Duell] said she was in Saratoga the night of the fire with Rob and took acid. She said they argued about Dave. She said she was fuzzy but they took a car to Schdy with a couple of other people. She said she waited across the street on Grant Ave but I told her the neighbors saw her on the street. She admitted to me that the neighbors had seen her and she was the one screaming and making a big commotion, my babies the house is on fire. She then said she was out of the car but was still fuzzy feeling and couldn't stop Rob. She said Rob was doing something behind the car. She said she saw Rob start the fire and saw the fire but walked away and got back in the car. She said a guy named Bryan drove and he was arrested.

*Id.* at ¶ 109.

## L. Jessica Galvin – October 24, 2013

On October 24, 2013, as part of the federal investigation, Detective Hesch interviewed Jessica Galvin who, at the time of the May 2, 2013 fire, was living at 423 Hulett Street. *See* Dkt. No. 87-7 at ¶ 110. In her sworn statement, Galvin stated that, at the time of the fire, she was

located in the front of her house where the living room would normally be. *See id.* at ¶ 111. She heard "sirens," looked out the window, and saw 438 Hulett Street on fire. *See id.* Galvin continued: "I Heard a woman's voice, Jennica, yelling 'my babies, my babies.' I knew it was Jennica because there was always drama at her house and she was yelling a lot." *Id.*

## M.    Further Investigation Into Edward Leon

Early on into the investigation, Special Agent Meeks became aware that, prior to the fire, David Terry had been arguing with his girlfriend's ex-boyfriend, Edward Leon. *See* Dkt. No. 85-2 at ¶ 35. Terry was dating Brianne Frolke, who was still living with Leon, who she had been dating for the previous four years. *See id.* Special Agent Meeks also learned that Frolke gave a statement to a Schenectady Police Department lieutenant on May 5, 2013. *See id.* at ¶ 36. Frolke said, among other things, that in the days or weeks preceding the fire, she received texts from an unfamiliar telephone number, one saying "hore [sic]" with a signature that said "I'm the undertaker." *Id.* Frolke further indicated that Terry informed her that he also received some threatening texts from the same number, one of which said he was not going to make it to his wedding day and another that said "die, Dave, die." *Id.* The U.S. Attorney's office subpoenaed the records for the telephone, which revealed that it was a pre-paid TracFone with no available subscriber information. *See id.* at ¶ 37.

In the days and weeks following the fire, investigators retrieved footage from all City of Schenectady street cameras in the area of 438 Hulett Street during the time frame that the fire started. *See* Dkt. No. 85-3 at ¶ 55. An investigator from the Schenectady Fire Department took still images of every vehicle captured by those cameras and created a binder of images of all of the vehicles that had passed through the area during the relevant time frame. *See id.*

Special Agent Meeks interviewed David Leon at the ATF's Tallahassee, Florida field office on November 14, 2013. *See id.* at ¶ 56. Leon continued to maintain that he was not in Schenectady on May 2, 2013, and had never been to 438 Hulett Street. *See id.*

Between June and December 2013, Special Agent Meeks investigated Leon's whereabouts on the day of the fire, his relationship with the residents of 438 Hulett Street, and any communications he may have had with those residents. *See id.* at ¶ 57. On or about January 2, 2014, Special Agents Meeks and Maher interviewed Leon again, and confronted him with evidence that had been gathered over the preceding months. *See id.* at ¶ 58. This evidence included footage of a minivan matching the description of Leon's, that was taken from a street camera from Hamilton Street in Schenectady at 4:13 a.m. on May 2, 2013. *See* Dkt. No. 85-1 at ¶ 30. Additionally, Leon was informed that cell tower coordinates from the "threat phone" had been obtained via a search warrant, and it was determined that Leon's phone and the "threat phone" used signals from cell towers in similar locations during the same time frames. *See id.*

In the face of that evidence, Leon admitted that he had gone to Schenectady on the morning of the fire, but claimed that he saw flames as he approached 438 Hulett Street. *See* Dkt. No. 85-3 at ¶ 58. While telling Special Agents Meeks and Maher about his trip to Schenectady on May 2, 2013, at one point Leon said that "we" parked the van, but then claimed to have misspoken, and said that he was alone on Hulett Street. *See id.* at ¶ 60. Additionally, Leon acknowledged that on April 25, 2013, he purchased a pre-paid cellular TracFone, and between April 25, 2013 and April 29, 2013, used that phone to send threatening text messages to Terry, Frolke, and other numbers associated with Terry, including phones owned by Urban and Duell. *See* Dkt. No. 85-1 at ¶ 31. Leon denied, and continues to deny, setting the fire at 438 Hulett Street. *See* Dkt. No. 85-3 at ¶ 59.

**N.     Legal Proceedings**

On June 4, 2013, Special Agent Meeks issued a criminal complaint against Plaintiff, charging him with maliciously damaging and destroying, by means of fire and explosive materials, in violation of Title 18, United States Code, Section 844(i).  Plaintiff waived a detention hearing and was held until on or about February 7, 2014, when the charge against him was dismissed without prejudice.

Leon, Duell, and Fish were subsequently prosecuted for making false statements to a federal grand jury in connection with the fire at 438 Hulett Street.  *See* Dkt. No. 85-3 at ¶¶ 61-62.  Leon was convicted after trial by a jury, and sentenced to 120 months' imprisonment.  *See United States v. Edward Leon*, No. 14-cr-412 (N.D.N.Y.).  Duell and Fish both pled guilty.  Duell was sentenced to 135 months' imprisonment and Fish was sentenced to 108 months' imprisonment.  *See United States v. Jennica Duell*, No. 14-cr-413 (N.D.N.Y.); *United States v. Bryan Fish*, No. 16-cr-314 (N.D.N.Y.).

Richard Ramsey subsequently recanted his testimony about Plaintiff borrowing his car.  *See* Dkt. No. 85-3 at ¶ 63.  He was also prosecuted for making false statements to a federal grand jury, pled guilty, and was sentenced to 87 months' imprisonment.  *See United States v. Ramsey*, No. 16-cr-314 (N.D.N.Y.).

### III. DISCUSSION

**A.     Standard of Review**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the

court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

## B.    42 U.S.C. § 1983

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976) (quoting 42 U.S.C. § 1983). Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained. *See Brown v. Coughlin*, 758 F. Supp. 876, 881 (S.D.N.Y. 1991) (citing *Martinez v. California*, 444 U.S. 277, 100 S. Ct. 553, 62 L. Ed. 2d 481, *reh. denied*, 445 U.S. 920, 100 S. Ct. 1285, 63 L. Ed. 2d 606 (1980)). As such, for a plaintiff to recover in a Section 1983 action, he must establish a causal connection between the acts or omissions of each

defendant and any injury or damages he suffered as a result of those acts or omissions. *See id.* (citing *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979)) (other citation omitted).

**C.    Malicious Prosecution Claim Under *Bivens v. Six Unknown Fed. Narcotics Agents***

In 42 U.S.C. § 1983, Congress provided a specific damages remedy for plaintiffs whose constitutional rights are violated by state officials. Congress provided no corresponding remedy for constitutional violations by agents of the Federal Government. Against this background, in 1971 the Supreme Court recognized in *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971) an implied damages action to compensate persons injured by federal officers who violated the Fourth Amendment's prohibition against unreasonable searches and seizures. In the following decade, the Supreme Court allowed *Bivens*-type remedies twice more, in a Fifth Amendment gender-discrimination case, *Davis v. Passman*, 442 U.S. 228 (1979), and in an Eighth Amendment Cruel and Unusual Punishments Clause case, *Carlson v. Green*, 446 U.S. 14 (1980). These are the only cases in which the Supreme Court has recognized an implied damages remedy under the Constitution itself. *Bivens*, *Davis* and *Carlson* were decided at a time when the prevailing law assumed that a proper judicial function was to "provide such remedies as are necessary to make effective" a statute's purpose. *J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964). The Supreme Court has since adopted a far more cautious course.

In the forty years since *Carlson*, the Supreme Court has not approved of any other implied damages remedy under the Constitution. *See Ziglar v. Abbasi*, ___ U.S. ___, 137 S. Ct. 1843, 1855 (2017). Indeed, the Supreme Court recently acknowledged that its analysis in *Bivens*, *Davis*, and *Carlson* "might be different if they were decided today." *Id.* at 1856. While those three cases remain "good law," the Supreme Court "has made clear that expanding the *Bivens* remedy is now

a 'disfavored' judicial activity." *Id.* at 1856-57 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)).

The Supreme Court has articulated the following two-part test for determining whether a *Bivens* remedy should be extended: "First, courts must determine whether the plaintiff is seeking a *Bivens* remedy in a new context. If the answer to this question is 'no,' then no further analysis is required. If the answer is 'yes,' then the court must determine whether 'special factors counsel[ ] hesitation.'" *Lanuza v. Love*, 899 F.3d 1019, 1023 (9th Cir. 2018) (citing *Abbasi*, 137 S. Ct. at 1859–60).

In the present matter, the Court finds that Plaintiff's malicious prosecution claim is seeking a *Bivens* remedy in a new context. It is true that *Bivens* itself was a case involving a claim under the Fourth Amendment. However, the Supreme Court has made clear that courts should not define a *Bivens* cause of action at the level of "the Fourth Amendment" or even at the level of "the unreasonable-searches-and-seizures clause." *FDIC v. Meyer*, 510 U.S. 471, 484 n.9 (1994).

For example, courts have not construed *Davis* – which permitted a congressional employee to sue for unlawful termination in violation of the Due Process Clause – as meaning that the entirety of the Fifth Amendment's Due Process Clause is fair game in a *Bivens* action. In fact, the Supreme Court rejected a claim under the same clause of the same amendment nine years after *Davis* was decided. *See Schweiker v. Chilicky*, 487 U.S. 412, 420 (1988) (rejecting a *Bivens* action under the Fifth Amendment's Due Process Clause for wrongful denial of Social Security disability benefits).

Even when a plaintiff has asserted a violation of the same clause of the same amendment in the same way, the Supreme Court has declined to find a *Bivens* remedy. In *Chappell v. Wallace*, 462 U.S. 296 (1983), the Supreme Court rejected a Fifth Amendment Due Process claim

for unlawful termination — the claim at issue in *Davis* — because the plaintiff was a military

servicemember rather than a congressional employee.  *See id.* at 305.

In *Abbasi*, the Supreme Court addressed this threshold question, holding that the "proper

test" to determine whether the claim is asserting a *Bivens* remedy in a new context is to ask

whether "the case is different in a meaningful way from previous *Bivens* cases."  *Abbasi*, 137 S.

Ct. at 1859.  The Court then provided a non-exhaustive list of "differences that are meaningful

enough to make a given context a new one":

> A case might differ in a meaningful way because of [1] the rank of
> the officers involved; [2] the constitutional right at issue; [3] the
> generality or specificity of the official action; [4] the extent of
> judicial guidance as to how an officer should respond to the
> problem or emergency to be confronted; [5] the statutory or other
> legal mandate under which the officer was operating; [6] the risk of
> disruptive intrusion by the Judiciary into the functioning of other
> branches; or [7] the presence of potential special factors that
> previous *Bivens* cases did not consider.

*Id.*

By any measure, Plaintiff's malicious prosecution claim is meaningfully different from the

Fourth Amendment claim at issue in *Bivens*.  Plaintiff is not alleging that the ATF Defendants

entered his home without a warrant or violated his rights to privacy.  Rather, Plaintiff claims that

the ATF Defendants initiated and continued a prosecution against him without probable cause and

that they misled prosecutors and the court by omitting material and exculpatory information when

bringing charges against him.  The claim involves different conduct by different officers from a

different federal agency.  As such, the Court agrees with the ATF Defendants that Plaintiff's claim

is a new context and cannot be shoehorned into *Bivens*, *Davis*, or *Carlson*.

The second question that the Court must determine is whether it should engage in the

"disfavored judicial activity" of recognizing a new *Bivens* action.  The Court believes that this

question must be answered in the negative. One significant "special factor" counseling against recognizing a *Bivens* claim for malicious prosecution is the existence of a statutory scheme for torts committed by federal officers. *See* 28 U.S.C. § 2680(h). The Supreme Court expressly recognized that "if there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Abbasi*, 137 S. Ct. at 1858. The law enforcement provision of the Federal Tort Claims Act ("FTCA") "extends the waiver of sovereign immunity to claims for six intention torts ... that are based on the 'acts or omissions of investigative or law enforcement officers.'" *Millbrook v. United States*, 569 U.S. 50, 52-53 (2013) (quoting 28 U.S.C. § 2680(h)). The six intentional torts to which it applies are "assault, battery, false imprisonment, false arrest, abuse of process, or *malicious prosecution*." 28 U.S.C. § 2680(h) (emphasis added). Indeed, cases are regularly brought against the United States for malicious prosecution. *See Gonzalez v. United States*, No. 16-cv-1494, 2018 WL 1597384 (E.D.N.Y. Mar. 31, 2018). And significantly, cases brought under the FTCA are ultimately decided by the court, not a jury.

Another factor weighing against finding an implied *Bivens* claim for malicious prosecution is the length of time Congress has gone without creating a *Bivens*-type remedy for this context. "Because Congress has long been on notice that the Supreme Court is disinclined to extend *Bivens* to new contexts, *see Abbasi*, 137 S. Ct. at 1857, its 'failure to provide a damages remedy' here suggests 'more than mere oversight.'" *Cantu v. Moody*, 933 F.3d 414, 423 (5th Cir. 2019).

Several federal courts have recently reached the same conclusion regarding implying a *Bivens* remedy for claims of malicious prosecution. *See, e.g.*, *Farah v. Weyker*, 926 F.3d 492, 496-99 (8th Cir. 2019) (declining to imply a *Bivens* remedy in a malicious prosecution case alleging that federal law enforcement officers exaggerated and invented facts in a report, hid

evidence that would have exonerated the plaintiffs, pressured and manipulated the alleged victims into lying, and deceived prosecutors); *Cantu*, 933 F.3d at 423-24 (declining to imply a *Bivens* remedy for a malicious prosecution case alleging that federal agents lied and fabricated evidence); *Karkalas v. Marks*, No. 19-cv-948, 2019 WL 3492232 (E.D. Pa. July 31, 2019) (same); *Latham v. United States*, No. 3:18-cv-2175, 2019 WL 857963 (N.D. Ohio Feb. 22, 2019) (declining to imply a *Bivens* remedy against ATF agents who allegedly suppressed exculpatory evidence and noting that the plaintiff should have proceeded under the FTCA); *Lane v. Schade*, No. 15-cv-1568, 2018 WL 4571672 (D.N.J. Sept. 24, 2018) (declining to allow a *Bivens* remedy for the plaintiff's malicious prosecution claims); *Lee v. Janosko*, No. 2:18-cv-1297, 2019 WL 2392661 (W.D. Pa. June 6, 2019) (declining to imply a *Bivens* remedy for the plaintiff's claim that law enforcement officers coerced a confession); *Boudette v. Sanders*, No. 18-cv-2420, 2019 WL 3935168 (D. Colo. Aug. 19, 2019) (finding new context and declining to imply a *Bivens* remedy for a malicious prosecution claim alleging that federal agents induced prosecutors to file false charges).  While the Court notes that at least one circuit has held post-*Abbasi* that a malicious prosecution claim is viable under *Bivens*, *see Jacobs v. Alam*, 915 F.3d 1028,1038-39 (6th Cir. 2019), the Court finds the reasoning set forth in the cases cited above to be persuasive.  Moreover, as the ATF Defendants correctly note, in *Jacobs*, the case involved the warrantless entry by federal agents into the plaintiff's home and is, therefore, squarely aligned with the factual scenario presented by *Bivens* itself.

For these reasons, the Court declines to imply a *Bivens* remedy in this context. Accordingly, the Court grants the ATF Defendants' motion for summary judgment.[3]

---

[3] Given the unsettled nature of this area of the law, and because it has not yet been addressed by the Second Circuit, the Court will proceed to address the merits of the ATF

(continued...)

**D.     Qualified Immunity**

"The doctrine of qualified immunity shields public officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).

> For a constitutional right to be "clearly established" for purposes of determining whether an officer is entitled to qualified immunity, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that *in the light of pre-existing law the unlawfulness must be apparent*."

*Mollica v. Volker*, 229 F.3d 366, 370-71 (2d Cir. 2000) (quoting *Anderson v. Creiehton*, 483 U.S. 635, 640 (1987)) (emphasis in original).  "Where the right at issue in the circumstances confronting police officers . . . was clearly established but was violated, the officers will nonetheless be entitled to qualified immunity 'if ... it was objectively reasonable for them to believe their acts did not violate those rights.'" *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (quotation and other citation omitted).

"Although a mere mistake in the performance of an official duty may not deprive the officer of qualified immunity, the doctrine does not shield performance that either (a) was in violation of clearly established law, or (b) was plainly incompetent." *Manganiello v. City of New York*, 612 F.3d 149, 165 (2d Cir. 2010) (citations omitted).  "With respect to both the legal question and the matter of competence, the officials' actions must be evaluated for objective

---

[3](...continued)
Defendants motion for summary judgment.

reasonableness.... That is, '[e]ven if the right at issue was clearly established in certain respects ... an officer is still entitled to qualified immunity if "officers of reasonable competence could disagree" on the legality of the action at issue in its particular factual context.'" *Id.* (quotations omitted).

The determination of whether an official's conduct was objectively reasonable is a mixed question of law and fact. *See Zellner*, 494 F.3d at 367 (citing *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004)) (other citations omitted). "The ultimate question of whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, *i.e.*, whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court." *Id.* (citation omitted). "However, '[a] contention that ... it was objectively reasonable for the official to believe that his acts did not violate those rights has "its principle focus on the particular facts of the case."'" *Id.* (quotation and other citations omitted).

If there is no dispute as to any material fact, the issue of whether the official's conduct was objectively reasonable is an issue of law to be decided by the court. *See id.* at 368 (citation omitted). Any unresolved factual issues, however, must be resolved by the jury. *See id.* (quoting *Kerman*, 374 F.3d at 109) (other citations omitted). Once the court has received the jury's decision as to "what the facts were that the officer faced or perceived," the court must then "make the ultimate legal determination of whether qualified immunity attaches on those facts." *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) (quotation omitted); *see also Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (quotation omitted).

**E.     Malicious Prosecution**

To prevail on a Section 1983 claim for malicious prosecution, "a plaintiff must show a violation of his rights under the Fourth Amendment . . . and must establish the elements of a malicious prosecution claim under state law." *Manganiello*, 612 F.3d at 161 (citations omitted). Under New York law, a plaintiff must establish four elements to support a malicious prosecution claim: "'(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Id.* (quotation and other citations omitted); *see also Dufort v. City of New York*, 874 F.3d 338, 350 (2d Cir. 2017) (quotation omitted). Initiating a criminal proceeding against a person without probable cause, coupled with a deprivation of liberty, is a Fourth Amendment violation. *See Murphy v. Lynn*, 118 F.3d 938, 944-45 (2d Cir. 1997) (citation omitted).

### 1. Initiation or Continuation of the State Prosecution

In their motion for summary judgment, the Schenectady Defendants argue that the undisputed facts make clear that Plaintiff's criminal prosecution was not initiated or continued by the Schenectady Defendants. *See* Dkt. No. 87-8 at 22-23. The Schenectady Defendants claim that, pursuant to custom and practice, Schenectady County District Attorney Robert Carney was present at the Schenectady Police Department on May 2, 2013, monitoring the unfolding investigation into the Hulett Street fire, including the questioning of Duell, Fish, and Plaintiff. *See id.* at 22. They also claim that District Attorney Carney was aware of the statements of the three neighbors who independently verified hearing Duell's voice outside of 438 Hulett Street around the time the fire started. *See id.* Although the Schenectady Defendants acknowledge that Detective Disbrow prepared the Felony Complaint, they claim that this was done at District Attorney Carney's behest, in furtherance of the prosecution he was initiating. *See id.* at 23. Since

the determination to prosecute Plaintiff was made by the District Attorney, the Schenectady Defendants contend that they did not legally initiate or continue Plaintiff's prosecution.  *See id.*

The Second Circuit has held that although "police officers do not generally "commence or continue" criminal proceedings against defendants, a claim for malicious prosecution can still be maintained against a police officer if the officer is found to 'play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.'" *Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015) (quotations omitted).  "This element might be satisfied by, for example, showing that an officer generated witness statements or was regularly in touch with the prosecutor regarding the case." *Id.* (citation omitted).

Recently, the New York Court of Appeals acknowledged that it has "'never elaborated on how a plaintiff in a malicious prosecution case demonstrates that the defendant commenced or continued the underlying criminal proceeding.'" *Torres v. Jones*, 26 N.Y.3d 742, 760-61 (2016) (quotation omitted).  "But, by suggesting that a defendant other than a public prosecutor may be liable for supplying false information to the prosecutor in substantial furtherance of a criminal action against the plaintiff, we have implicitly recognized that such conduct may, depending on the circumstances, constitute the commencement or continuation of the prosecution." *Id.* at 761 (citations omitted); *see also Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983) (noting that proof establishing "that the police witnesses" have falsified evidence may create liability for malicious prosecution); *Hopkinson v. Lehigh Val. R.R. Co.*, 249 N.Y. 296, 300-01 (1928) (noting that the falsification of evidence and presentation of that evidence to the prosecutor can constitute commencement of a prosecution).

In the present matter, the Court finds that the Schenectady Defendants have established that they did not initiate or continue Plaintiff's state prosecution.  The undisputed facts clearly

demonstrate that Detective Disbrow only filed the felony complaint against Plaintiff after consultation with District Attorney Carney. *See* Dkt. No. 87-3 at ¶¶ 17-18; Dkt. No. 87-2 at ¶¶ 29-30; Dkt. No. 87-4 at ¶¶ 42-43. Pursuant to established procedure within the Schenectady Police Department, charges were only initiated after consultation with the District Attorney's Office. *See id.* District Attorney Carney was present throughout the initial interviews of Duell, Fish, and Plaintiff and was fully aware of the strengths and weaknesses in any case against Plaintiff.

Indeed, nearly all cases in which law enforcement officers were found to have initiated or continued a prosecution for purposes of a malicious prosecution claim involve officers who provided knowingly false and/or fabricated evidence to unwitting prosecutors. *See*, *e.g.*, *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *Ramos v. City of New York*, 285 A.D.2d 284, 299 (1st Dep't 2001). No such facts are before the Court in the present matter. With the District Attorney present for the interrogations and giving the instruction to file the felony complaint against Plaintiff, the Schenectady Defendants simply did not initiate the state prosecution against Plaintiff; and, therefore, the Schenectady Defendants are entitled to summary judgment on this basis.

### 2. Initiation of the Federal Prosecution

As with the Schenectady Defendants, the ATF Defendants argue that the decision to charge Plaintiff federally and when to dismiss the complaint against him, were made by federal prosecutors and not by the ATF Defendants. *See* Dkt. No. 85 at 27. Since there is no evidence that the ATF Defendants withheld evidence or misrepresented it, they argue that they had no power to continue the prosecution and cannot be held liable for malicious prosecution. *See id.* at 27-28 (quoting *Nzegqu v. Friedman*, 605 Fed. Appx. 27, 31-32 (2d Cir. 2015)).

There is a rebuttable presumption that criminal proceedings are initiated by prosecutors, not arresting officers. *See Mitchell v. Victoria Home*, 434 F. Supp. 2d 219, 228 (S.D.N.Y. 2006) (citation omitted). In general, "'[o]nce a criminal defendant has been formally charged, the chain of causation between the officer's conduct and the claim of malicious prosecution is broken by the intervening actions of the prosecutor, thereby abolishing the officer's responsibility for the prosecution.'" *Douglas v. City of New York*, 595 F. Supp. 2d 333, 342 (S.D.N.Y. 2009) (quotation and other citations omitted); *see also Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999). To overcome this presumption, a plaintiff must establish that the agents withheld exculpatory evidence from the prosecutor, or knowingly created false information that forms the basis for the prosecution. *See id.*; *see also Mitchell*, 434 F. Supp. 2d at 228. "[I]n the absence of evidence that the police officer misled or pressured the official who could be expected to exercise independent judgment," a claim of malicious prosecution against the officer must fail. *See Townes*, 176 F.3d at 147 (citations omitted).

In the present matter, the undisputed facts make clear that the decision to charge Plaintiff federally, and the decision whether and when to dismiss the case against him, were made by federal prosecutors and not by the ATF Defendants. Further, the record is devoid of any evidence indicating that the ATF Defendants falsified evidence, fabricated evidence, misrepresented witness testimony, or failed to forward relevant evidence or exculpatory information to the prosecutors. Rather, the record establishes that federal prosecutors were made contemporaneously aware of all witness statements and evidence as it was gathered by the ATF Defendants and others. Moreover, in most instances, apart from the initial interviews, the prosecutors participated in or were at least present for independent interviews of witnesses, and could make their own determinations as to the materiality and credibility of their statements. For example, Defendants

Meeks and Maher, and federal prosecutors interviewed Duell, in the presence of her attorney on May 22, May 24, and June 6, 2013, and she testified before a federal grand jury on May 24, 2013. In each of these later statements, Duell implicated herself, to an ever-increasing degree, in the murder of her own children. *See, e.g.*, Dkt. No. 85-21 at 2-3; Dkt. No. 85-34. While some portions of her story changed over time, such as who drove, the route that was taken, where they stopped for gas, the essence of her story remained the same.

In short, Plaintiff's criminal case was fully managed by the federal prosecutors, who independently interviewed all relevant witnesses and then decided to bring charges against Plaintiff. There is no evidence that the ATF Defendants withheld relevant evidence from the prosecutors, or provided false evidence to them, as would be necessary to establish that the ATF Defendants were responsible for initiating or continuing the prosecution. As such, the ATF Defendants are entitled to summary judgment because Plaintiff failed to satisfy the first element of his malicious prosecution claim. *See Battisti v. Rice*, No. 10-cv-4139, 2017 WL 78891, *10 (E.D.N.Y. Jan. 9, 2017) (dismissing the plaintiff's malicious prosecution claim because "[t]here is no evidence that either officer importuned [the prosecutor] to prosecute Plaintiff or that either officer fabricated or withheld evidence from [the prosecutor]") (citation omitted); *Stukes v. City of New York*, No. 13-cv-6166, 2015 WL 1246542, *9 (E.D.N.Y. Mar. 17, 2015).

### 3. Actual or Arguable Probable Cause for Plaintiff's State Prosecution

In their motion for summary judgment, the Schenectady Defendants contend that the probable cause standard was clearly satisfied at the time the state prosecution was initiated. *See* Dkt. No. 87-8 at 24-25. Plaintiff, however, contends that the only evidence that led to Plaintiff's prosecution was based on coerced statements. *See* Dkt. No. 96-13 at 24-32. Plaintiff claims that Duell was present in the interview room for at least nine and a half hours and that her interview

did not begin until approximately three hours after she arrived at the station. *See id.* at 27-28.

Plaintiff argues that the Schenectady Defendants failed to provide Duell with an opportunity to

grieve or to check on her sole surviving child, and instead "pressed forward on a deliberate course

to implicate [P]laintiff." *Id.* at 28.

Probable cause, an element of a malicious prosecution claim, is "evaluated on the totality

of the circumstances." *Jenkins v. City of New York*, 478 F.3d 76, 90 (2d Cir. 2007) (citation

omitted). In a malicious prosecution case, the timing of a probable cause determination is crucial.

"Although the existence of probable cause must be determined with reference to the facts of each

case, in general '[p]robable cause to arrest exists when the officers have knowledge of, or

reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a

person of reasonable caution in the belief that an offense has been or is being committed by the

person to be arrested.'" *Manganiello*, 612 F.3d at 161 (quotation and other citations omitted).

The Second Circuit has explained that

> [u]nder New York law, "even when probable cause is present at the
> time of arrest, evidence could later surface which would eliminate
> that probable cause.'... In order for probable cause to dissipate, the
> groundless nature of the charges must be made apparent by the
> discovery of some intervening fact.... The New York Court of
> Appeals has noted that "the failure to make a further inquiry when a
> reasonable person would have done so may be evidence of lack of
> probable cause."

*Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) (quotations and other citations

omitted).

Additionally, because the doctrine of qualified immunity "affords officials 'breathing room

to make reasonable but mistaken judgments' without fear of potentially disabling liability," the

court must use "a deliberately 'forgiving' standard of review" in determining its application.

*Zalaski v. City of Hartford*, 723 F.3d 382, 389 (2d Cir. 2013) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546, 132 S. Ct. 1235 (2012)) (other quotation omitted). To this point, "[a]n officer is entitled to qualified immunity if he can establish that there was 'arguable probable cause' to arrest." *Adebiyi v. City of New York*, No. 13-CV-480, 2014 WL 4922888, *5 (E.D.N.Y. Sept. 30, 2014) (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)). Arguable probable cause is an "analytically distinct test for qualified immunity" that "is more favorable to the officers than the one for probable cause." *Escalera*, 361 F.3d at 743. "Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" *Id.* (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)).

In the present matter, the Court finds that the Schenectady Defendants had probable cause to initiate the state prosecution. Detectives Steele, Disbrow, and Hesch had three sworn statements by neighbors who knew Duell and who independently recognized Duell's voice outside 438 Hulett Street at the time of the fire. When apprised of this information during her May 2, 2013 questioning, Duell promptly changed her story and admitted that she, Fish, and Plaintiff left Saratoga for Schenectady in the early morning hours of May 2, 2013, and watched Plaintiff start the fire.

Moreover, the Schenectady Defendants appropriately relied on Plaintiff's statement on May 2, 2013. As mentioned above, while alone in the interrogation room, Plaintiff was recorded saying the following: "I didn't want to do it, Jennica. The kids, oh, my God." Dkt. No. 87-7 at ¶ 41; *see also* Butler Tr. at 2. While Plaintiff claims that it is unclear exactly what was said, the Court has reviewed the recording of this interview and it is clear that Plaintiff stated what was reported in the transcript of the interview. *See* Dkt. No. 88, Exhibit A(2) at 02:25-02:35. This

statement clearly portrayed Plaintiff as feeling guilty for what transpired and was appropriately relied upon.

Additionally, while Plaintiff attempts to portray the questioning of Duell on May 2, 2013, as coercive, the record reflects otherwise. The record reflects that at 3:26 p.m., Detective Steele introduced himself. Shortly thereafter, between 3:34 p.m. and 3:38 p.m., Duell was provided with written *Miranda* warnings, which she acknowledged and signed. *See* Duell Tr. at 15-17. As the Schenectady Defendants correctly note, this, "in and of itself, is highly probative of voluntariness[.]" *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 528 (S.D.N.Y. 2015) (citing *Missouri v. Seibert*, 542 U.S. 600, 608-09 (2004)).

At approximately 5:41 p.m., after Duell's initial denials, Detectives Steele and Disbrow informed her that her neighbors had identified her as being at the scene of the fire around the time it was started. *See id.* at 114-16. Two minutes later, at 5:43 p.m., Duell admitted to being at the scene with Plaintiff and Fish, and stated that Plaintiff started the fire. *See id.* at 116-17. At approximately 6:11 p.m., Detective Steele left the interview room and did not return. *See id.* at 148. Plaintiff denies this sequence of events, asserting that Duell made no admission until she was told that Plaintiff had lied about whether he had an employer or was self-employed (an issue related to a hurtful text Duell had received). Contrary to Plaintiff's claims, the recorded interrogation makes clear that Duell made her initial admission upon being confronted with the testimony of her three neighbors. *See id.* at 76-78, 114-17.

Additionally, although Duell was kept waiting alone in the interview room for some time, it was just over two hours after the questioning began that she admitted to being at the scene with Plaintiff and Fish. Moreover, the video makes clear that, while Detectives Steele and Disbrow were persistent in their questioning, they were polite and considerate and were not in uniform or

brandishing weapons. In short, there was nothing untoward or coercive about the questioning of Duell.

Plaintiff also takes issue with the Schenectady Defendants' interrogation of Fish, claiming that it was overly coercive. *See* Dkt. No. 96-13 at 30-32. Specifically, Plaintiff takes issue with the fact that Fish was told that he would be prosecuted to the full extent of the law if he chose not to cooperate, the fact that the Schenectady Defendants conveyed the benefits of cooperating, and the fact that questioning continued after Fish claimed to have "blacked out." *Id.*

Contrary to Plaintiff's position, there is nothing coercive about truthfully telling a suspect that he will be prosecuted to the full extent of the law if he chooses not to cooperate. *See Mara v. Rilling*, 921 F.3d 48, 80 (2d Cir. 2019) (citations omitted). Further, the Second Circuit has held that there is nothing improper about police continuing to press a witness once that witness claims that he was so intoxicated that he could not recall what had happened. *See id.* at 90.

As discussed in more detail above, Duell and Fish were far from ideal witnesses who told varying accounts as to what transpired on May 2, 2013. However, even as inconsistencies developed in their stories during the days and weeks following the fire, Duell and Fish never wavered from the core of their account – *i.e.*, that they traveled from Saratoga to Schenectady with Plaintiff and that Plaintiff started the fire. To the extent that inconsistencies did develop, they were in the details of how they got there (who drove, the color of the car, the route that they took, etc.). These inconsistencies, and the possibility that someone else might have been responsible for the fire, do not change that fact that the Schenectady Defendants had probable cause to arrest and file the felony complaint against Plaintiff. *See Kerman v. City of New York*, 261 F.3d 229, 241 (2d Cir. 2001).

Even assuming that the Schenectady Defendants lacked probable cause to arrest and charge Plaintiff, they undoubtedly had arguable probable cause and are therefore entitled to qualified immunity. The evidence as set forth above clearly indicate that the Schenectady Defendants, during the few days they were involved in Plaintiff's prosecution, held "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Escalera*, 361 F.3d at 743 (quotation marks omitted).

Accordingly, the Court grants the Schenectady Defendants' motion for summary judgment on this alternative ground.

### 4. Arguable Probable Cause for Plaintiff's Federal Prosecution[4]

In his response to the ATF Defendants' motion for summary judgment, Plaintiff contends that the ATF Defendants did not have arguable probable cause because (1) Duell's May 2 and May 5, 2013 statements, and Fish's May 2 and May 6, 2013 statements were coerced; (2) the ATF Defendants allegedly failed to make further inquiry into Edward Leon as a suspect and into the inconsistencies in witness statements; and (3) there were allegedly false statements and material omissions in the affidavit in support of the federal criminal complaint. In response, the ATF Defendants disagree and contend that the undisputed facts demonstrate that they "acted with at least arguable probable cause at all relevant times." Dkt. No. 97 at 6.

As to Plaintiff's first argument, as discussed above, the initial interviews of Duell and Fish on May 2, 5 and 6, 2013, were not coercive. Even assuming they could be deemed coerced statements, the federal prosecution of Plaintiff was not based on these allegedly coerced

_____

[4] The Court notes that the ATF Defendants have limited their argument as to whether they had arguable probable cause to arrest and prosecute Plaintiff.

statements. Rather, after the U.S. Attorney's Office decided to take over the prosecution, the ATF Defendants began their investigation anew. *See* Dkt. No. 85-2 at ¶¶ 14-23. Together with the federal prosecutors, the ATF Defendants re-interviewed both Duell and Fish. *See id.* at ¶ 20; Dkt. No. 85-1 at ¶¶ 13-14, 19-21, 23 25.

Independent of the early interviews of Fish and Duell, federal prosecutors conducted their own interviews of them (and all other relevant witnesses) and presented their testimony to a federal grand jury before the federal arrest warrant issued. As such, the federal arrest and prosecution were not motivated by the allegedly coerced statements, but by the independent judgment of the prosecutors, as informed by their own meetings with these witnesses. *See Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015) (holding that the law enforcement officers were entitled to summary judgment on the plaintiff's malicious prosecution claim despite allegations of overly suggestive photo identification and coercion of a witness where the prosecutor had an opportunity to re-interview the witnesses before they testified in front of the grand jury).

Additionally, nothing in the record supports Plaintiff's argument that the ATF Defendants failed to make further inquiry where a reasonable person would have done so, in particular with respect to Edward Leon as a potential suspect and with inconsistencies in Duell's and Fish's stories. *See* Dkt. No. 96-13 at 35-37. After the filing of the criminal complaint, Special Agents Meeks and Maher essentially worked parallel investigative tracks, with Special Agent Meeks primarily focused on investigating Leon's potential involvement and Special Agent Maher focused on continuing to develop the evidence to support Plaintiff's prosecution. *See* Dkt. No. 85-2 at ¶¶ 35-54.

Detective Hesch interviewed Leon on June 19, 2013, during which Leon stated that he was working as a driver for Quandt's on May 2, 2013. *See id.* at ¶ 40. Leon indicated that he arrived at work around 5:00 a.m., before which he stopped at Cumberland Farms in Palentine Bridge. *See id.* After the interview, Special Agent Meeks subpoenaed Leon's employment records, which he received on June 28, 2013. *See id.* at ¶ 41. The records showed that Leon clocked into Quandt's at 4:58 a.m. on May 2, 2013, which was consistent with his statement that he arrived for work around 5:00 a.m. *See id.* Special Agent Meeks also subpoenaed, received, and reviewed security camera footage from the Cumberland Farms in Palentine Bridge. *See id.* at ¶ 42. On August 30, 2013, Special Agent Meeks identified on that footage a white male matching Leon's description and wearing a Quandt's uniform enter the store at 4:19:52 a.m. and leave with coffee at 4:21:33 a.m., again consistent with the statement Leon provided to Detective Hesch. *See id.*

Additionally, when Brianne Frolke provided her statement on May 5, 2013, she indicated that she was not sure what time Leon awoke the morning of May 2, 2013. *See* Dkt. No. 85-2 at ¶ 43. However, when Frolke met with federal prosecutors on October 24, 2013, she stated that she believed Leon's alarm went off around 3:00 a.m. and that Leon texted her at 3:46 a.m. to say good morning. *See id.* Based on this new timeline, on October 25, 2013, Special Agent Meeks looked again at the Cumberland Farms security camera footage for earlier in the morning on May 2, 2013, and identified an individual matching Leon's description entering Cumberland Farms at 3:24 a.m. *See id.* Detective Hesch confirmed that the individual was Leon, and Special Agent Meeks later confirmed that the individual he first believed to be Leon was one of Leon's co-workers at Quandt's. *See id.*

Following the discovery of this earlier timeline, investigators retrieved footage from all City of Schenectady street cameras in the area of 438 Hulett Street during the time frame that the

fire had started.  *See id.* at ¶ 44.  Additionally, an investigator from the Schenectady Fire

Department took still images of every vehicle captured by those cameras, and created a binder of

images of all of the vehicles that had passed through the area during the relevant time frame.  *See*

*id.*  Realizing that Leon's earlier timeline would have provided sufficient time for him to travel to

Schenectady before going to Quandt's, Special Agent Meeks reviewed those images for any

vehicles matching the description of Leon's vehicle.  *See id.* at ¶ 45.  According to Frolke, Leon

was driving a light-colored minivan with a darker-colored rear hatch in May 2013.  *See id.*  On or

about November 7, 2013, the agents identified a light-colored minivan with a darker rear hatch on

Hamilton Street, at 4:13 a.m. on May 2, 2013.  *See id.*; *see also* Dkt. No. 85-69 at 2.

Based on this new information, Special Agent Meeks, with the assistance of other agents,

began searching for Leon's minivan, which he had sold to a salvage yard after his then-girlfriend

hit a deer while driving it.  *See* Dkt. No. 85-2 at ¶ 46.  The minivan was ultimately located at a

salvage yard in Marcy, New York, which Special Agent Meeks purchased using ATF funds.  *See*

*id.*  Special Agent Meeks also located and purchased parts that had already been removed from the

vehicle, replaced them, and then engaged the assistance of the FBI in conducting a comparison

between Leon's vehicle and the minivan captured by the Schenectady street cameras.  *See id.*  The

results of the comparison were inconclusive, and the FBI could not confirm or rule out that the

two vehicles were the same.  *See id.*

During this same time period, Special Agent Meeks interviewed Leon's family members,

ex-girlfriend, and ex-spouse, as well as Frolke's parents.  *See id.* at ¶ 47.  Special Agent Meeks

learned that for the past twenty years, Leon had been doing seasonal work with Wheelock

Carnival Company, and that he had left in late May or early June 2013 to go on the road with the

carnival.  *See id.* at ¶ 48.  After identifying Leon on the Cumberland Farms security footage and a

vehicle matching the description of his vehicle on the street cameras, Special Agent Meeks increased his efforts to locate Leon, and discovered that he was in Tallahassee, Florida. *See id.*

On November 14, 2013, Special Agent Meeks traveled to Florida and interviewed Leon at the ATF's Tallahassee field office. *See* Dkt. No. 85-2 at ¶ 49. Leon's statement was largely consistent with his prior interview with Detective Hesch, except that he indicated that he left his house earlier than originally stated, got to work early (he could not recall the time), caught up on paperwork, and then clocked in approximately fifteen minutes before his departure time for his delivery route. *See id.* Special Agent Meeks asked for and Leon consented to a forensic examination of the contents of his cell phone and, at the conclusion of the interview, Special Agent Meeks served Leon with a subpoena to testify before a grand jury on November 22, 2013. *See id.* Leon's grand jury testimony was consistent with his statements made to Special Agent Meeks, and he continued to maintain that he was not in Schenectady on May 2, 2013, and had never been to 438 Hulett Street. *See id.* at ¶ 50.

Thereafter, in December of 2013, Special Agent Meeks received records of a cell phone that had been sending threatening messages to Frolke and Terry (the "5593 phone"), which included location information for that phone that was not available from the original subpoenaed records. *See id.* at ¶¶ 36, 51.[5] One of the prosecutors assigned to the case mapped those locations together with locations from Leon's cell phone, and determined that the phones used signals from cell towers in similar locations during the same time frames. *See id.* at ¶ 51. Prosecutors and investigators, including Special Agent Meeks, were then able to match these locations to Leon's location based on his travel routes evidenced in his employment records. *See id.*

_____

[5] Earlier in the investigation, the U.S. Attorney's Office subpoenaed records for the 5593 phone, which revealed that it was a pre-paid TracPhone with no available subscriber information. *See* Dkt. No. 85-2 at ¶ 37.

On or about January 2, 2014, Special Agents Maher and Meeks interviewed Leon again, and confronted him with the images from the security camera at Cumberland Farms, the still photos of the light colored minivan obtained from Schenectady street cameras, and documentation of the use of the 5593 phone in the same locations, at the same time as his personal cell phone. *See* Dkt. No. 85-2 at ¶ 52. Faced with this information, Leon acknowledged that on April 25, 2013, he purchased a pre-paid cellular TracFone, and between April 25, 2013 and April 29, 2013, he used that phone to send threatening text messages to Terry, Frolke, and other numbers associated with Terry, including phones owned by Urban and Duell. *See id.* Leon further admitted that, on the morning of May 2, 2013, he left his house before 3:00 a.m., stopped for coffee at approximately 3:25 a.m., then traveled to Schenectady. *See id.* Leon acknowledged that he parked and approached 438 Hulett Street on foot, but claimed that, as he approached, he saw fire on the front porch. *See id.* At this point, Leon claimed that he immediately walked back to his minivan and drove away. *See id.* Leon denied, and continued to deny, setting the fire at 438 Hulett Street. *See id.*

On January 10, 2014, Leon again testified before the grand jury and acknowledged that he had sent threatening text messages to Terry, and that he was in Schenectady on the morning of the fire. *See* Dkt. No. 85-2 at ¶ 54. Additionally, on January 31, 2014, Duell again testified before the grand jury, and recanted her prior testimony, and claimed that she, Plaintiff, and Fish never left Saratoga the night of May 1-2, 2013. *See id.* at ¶ 55. On February 7, 2014, in light of Leon's admission that he was in Schenectady the morning of the fire and witness recantations, the U.S. Attorney's Office dismissed the charges against Plaintiff. *See id.* at ¶ 56.

Based on this evidence and contrary to Plaintiff's allegations, it is clear that the ATF Defendants did not fail to make further inquiry into other evidence and matters where a reasonable

officer would have. Rather, in spite of the testimony of Duell and Fish consistently implicating Plaintiff, and the other evidence that supported their original version of what transpired on May 2, 2013, the ATF Defendants continued to pursue all leads potentially implicating Leon in the fire. While there were minor inconsistencies in Duell and Fish's version of events, they did not waver from the core of their account and these inconsistencies are insufficient to find a lack of actual or arguable probable cause.

Finally, Plaintiff argues that probable cause was lacking for his arrest on federal charges because, he contends, there were false statement and material omissions in the affidavit supporting the federal criminal complaint. *See* Dkt. No. 96-13 at 38-40. Initially, the Court notes that, while Plaintiff makes the bald assertion that the affidavit contained false statements, he does not identify any particular statement in the affidavit that is false. Rather, Plaintiff contends that the statements of Duell and Fish were included in the affidavit with "an indifference to their truth." *Id.* at 38. Again, this argument rests on Plaintiff's assertion that their statements were coerced. However, as discussed above, by the time that the criminal complaint was filed in federal court, Duell had met with prosecutors and agents at least three times, represented by counsel on each of these occasions, and continued to implicate herself and Plaintiff in starting the fire.

Plaintiff also claims that Special Agent Meek's affidavit in support of the federal complaint omitted material information – namely that Fish acknowledged being untruthful with federal agents and with the grand jury when he said that it was his brother that drove him, Plaintiff, and Duell to Schenectady. *See* Dkt. No. 96-13 at 39-40. While it is true that Special Agent Meeks did not specifically discuss that Fish admitted to the agents that he falsely implicated his brother as being the driver of the vehicle on May 2, 2013, the affidavit in support of

-43-

the complaint specifically notes that the witnesses have changed their stories over time. Specifically, the affidavit states as follows: "The other two people initially also said they had been in Saratoga all night, but later gave sworn statements describing their presence with Butler in Schenectady when he set the fire. Their statements, and those of other witnesses, have developed over time, and there are some inconsistencies between witness accounts of the route of travel, acquisition of gasoline, and other details." Dkt. No. 85-38 at ¶ 9. The affidavit concludes, however, that "after recanting their initial echoing of Butler's alibi, both eyewitnesses have consistently stated that Butler set the fire." *Id.*

Where, as here, a plaintiff alleges that an affiant knowingly or recklessly misrepresented information, he must show that "misstatements and omissions were 'necessary to the finding of probable cause.'" *Escalera*, 361 F.3d at 743 (citation omitted). The court is required to "'assess the materiality of alleged misstatements in a warrant application by putting aside allegedly false material, supplying any omitted information, and then determining whether the contents of the "corrected affidavit" would have supported a finding of probable cause' for the stated crime." *Moulthrop v. Slavin*, 700 Fed. Appx. 75, 77 (2d Cir. 2017) (quoting *Loria v. Gorman*, 306 F.3d 1271, 1289 (2d Cir. 2002)).

Contrary to Plaintiff's assertions, probable cause to charge Plaintiff federally would have still existed even had Fish's declaration been disclosed. Despite acknowledging that he had been untruthful regarding the involvement of his brother, Fish continued to maintain that he, Duell, and Plaintiff traveled to Schenectady together and that Plaintiff poured gasoline in the stairwell leading to the upstairs apartment at 438 Hulett Street, lit it with a lighter, and then they all drove back to Schenectady. Additionally, Duell, at the urging of counsel, continued to maintain that the three had traveled from Saratoga to Schenectady and that Plaintiff started the fire. Moreover,

three separate witnesses heard Duell's voice at the scene around the time the fire started. Further, Mindy Sherman testified that Plaintiff stepped on her hand while she slept on the living room floor, presumably on his way out of the apartment. Further, text messages were retrieved from Fish's phone from the days prior to the fire, stating that Plaintiff was "about to go to [S]chenectady to split some wigs" and that he "wants to kill [C]hris and his two friends," referring to Chris Urban, CJ Miller, and David Terry – the adult occupants of 438 Hulett Street. Other witnesses informed agents and prosecutors that Plaintiff was angry with Terry the night of the fire, said he wanted to hurt him, and was talking about going to Schenectady. Finally, Special Agent Meeks interviewed an inmate who was housed with Plaintiff at the Schenectady County Jail on the same day that the complaint was filed. This inmate recounted that Plaintiff stated that he was concerned that he would be caught on cameras that were located on Hulett Street around the time the fire was started. *See* Dkt. No. 85-37 at 2. The inmate also indicated that Plaintiff was worried that police would find a threatening text that Plaintiff had sent to Terry that contained the words, "I'm gonna see you and when you least expect it, Boom!" *Id.* Finally, this inmate informed Special Agent Meeks that Plaintiff told him that the fire was started with gasoline and a lighter. *See id.*

These facts, as set forth in more detail above, are clearly sufficient to support a finding of arguable probable cause. Providing more detail regarding various inconsistencies or outright lies in Duell's and Fish's prior statements would not have vitiated the probable cause. In sum, the omitted facts would not have vitiated the finding of probable cause and, therefore, were not material. *See Walczyk v. Rio*, 496 F.3d 139, 161 (2d Cir. 2007) (holding that "the law does not demand that an officer applying for a warrant 'volunteer every fact that arguable cuts against the

existence of probable cause,' as long as he does 'not omit circumstances that are critical' to its evaluation") (quotation omitted).

Accordingly, the Court grants the ATF Defendants' motion for summary judgment on this alternative ground.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the reasons set forth herein, the Court hereby

**ORDERS** that the Schenectady Defendants' motion for summary judgment (Dkt. No. 83) is **GRANTED**; and the Court further

**ORDERS** that the ATF Defendants' motion for summary judgment (Dkt. No. 84) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 23, 2020
     Albany, New York

Mae A. D'Agostino
U.S. District Judge